

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 14, 2025**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| VISTA PROPPANTS AND | § | Case No. 20-42002-ELM |
| LOGISTICS, LLC, *et al.*, | § | |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | |
| MAALT, LP, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| SEQUITUR PERMIAN, LLC, | § | |
| | § | Adversary No. 20-04064 |
| Defendant/Third-Party Plaintiff, | § | |
| v. | § | |
| | § | |
| VISTA PROPPANTS AND | § | |
| LOGISTICS, LLC, | § | |
| | § | |
| Third-Party Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

In this removed action, MAALT, LP ("**Maalt**") has brought suit against Sequitur Permian,

LLC ("**Sequitur**") to recover damages under a Terminal Services Agreement – an oil transloading

services agreement – that Maalt alleges Sequitur breached. Sequitur disputes the claim and has asserted counterclaims against Maalt, as well as third-party claims against Vista Proppants and Logistics, LLC ("**Vista**"), Maalt's parent company, for promissory estoppel, fraudulent inducement, negligent misrepresentation, breach of contract, and declaratory judgment relief.

The dispute culminated in a six-day trial before the Court, at the conclusion of which the Court took the matter under advisement. Having now considered Maalt's Complaint, Sequitur's Answer, Sequitur's Counterclaims, Maalt's Answer, Sequitur's Third-Party Claims, Vista's Answer, Sequitur's Bankruptcy Claims, the Claim Objection, the Pretrial Filings, the Pretrial Order, the Joint Stipulations, the Additional Stipulations, the evidence presented, and the representations and arguments of counsel, and having taken into account each of the previously entered Summary Judgment Orders, the Court now issues this Memorandum Opinion in resolution of the dispute.

## *PROCEDURAL BACKGROUND*

On June 9, 2020 (the "**Petition Date**"), Vista and Maalt each filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, thereby initiating their respective bankruptcy cases with the Court.[1] The cases (along with those of several of their affiliates) were procedurally consolidated for joint administration under Case No. 20-42002 (the "**Bankruptcy Case**").

Prior to the Petition Date, on February 13, 2019, Maalt filed suit against Sequitur in the 51st Judicial District Court of Irion County, Texas (the "**State Court**") under Cause No. CV19-003 (the "**State Court Case**").[2] On April 15, 2020, Maalt filed its *Second Amended Original Petition*

---

[1] Vista's filing initiated Case No. 20-42002 with the Court. Maalt's filing initiated Case No. 20-42008 with the Court.

[2] *See* Docket No. 1-1, Tab B, at ECF pp.6-10 (*Plaintiff's Original Petition* filed by Maalt against Sequitur).

against Sequitur in the State Court Case (the "**Complaint**").[3]   On April 30, 2020, Sequitur responded to the Complaint with its *Original Answer, Verified Denial and Affirmative Defenses to Plaintiff's Second Amended Petition* ("**Sequitur's Answer**").[4]

Separately, on April 15, 2020, Sequitur filed its *Third Amended Counterclaims and Second Amended Third-Party Claims* in the State Court Case to assert counterclaims against Maalt and third-party claims against Vista.[5]   On April 30, 2020, Maalt filed its *Third Amended Answer to Counterclaims* in response to the counterclaims ("**Maalt's Answer**").[6]

On September 4, 2020, following the Petition Date, Maalt filed a *Notice of Removal* with this Court to remove all of the live claims and causes of action asserted by each of the parties in the State Court Case to this Court pursuant to 28 U.S.C. § 1452(a).[7]   The removal initiated the above-captioned adversary proceeding.

Subsequent to the removal and with leave of court, Sequitur filed its *Fourth Amended Counterclaims and Third Amended Third-Party Claims* to assert further amended counterclaims against Maalt (the "**Counterclaims**") and further amended third-party claims against Vista (the "**Third-Party Claims**").[8]   On December 21, 2020, Vista filed its *Answer* in response to the Third-Party Claims ("**Vista's Answer**").[9]

---

[3] *See* Docket No. 1-1, Tab V, at ECF pp.347-358 (Complaint).

[4] *See* Docket No. 1-1, Tab Z, at ECF pp.385-392 (Sequitur's Answer).

[5] *See* Docket No. 1-1, Tab W, at ECF pp.359-376 (Sequitur's *Third Amended Counterclaims and Second Amened Third-Party Claims*).

[6] *See* Docket No. 1-1, Tab Y, at ECF pp.381-384 (Maalt's Answer).

[7] *See* Docket No. 1.

[8] *See* Docket No. 45 (Sequitur's *Fourth Amended Counterclaims and Third Amended Third-Party Claims*); *see also* Docket No. 38 (order granting leave).

[9] *See* Docket No. 67 (Vista's Answer).  Maalt did not file a new answer in response to the further amended Counterclaims.  It has relied upon its last filed answer in the State Court Case (referred to herein as Maalt's Answer), which includes a general denial and certain specified affirmative defenses.

Separately, on August 17, 2020, in connection with the Bankruptcy Case, Sequitur filed a proof of claim against Vista (Claim No. 142 in Case No. 20-42002) and Maalt (Claim No. 143 in Case No. 20-42008) to assert a claim in the amount of $4,029,977.00 against each of them for alleged "[d]amages arising from [the] Terminal Services Agreement" (the "**Bankruptcy Claims**").[10]   In support, Sequitur attached both a summary that cross-references the litigation between the parties and a copy of its then-live *Third Amended Counterclaims and Second Amended Third-Party Claims* from the State Court Case.  Thus, the Bankruptcy Claims are predicated upon the Third-Party Claims as to Vista and the Counterclaims as to Maalt.  On September 24, 2020, Vista and Maalt filed the *Debtors' Objection to Sequitur Permian, LLC's Proofs of Claim* in the Bankruptcy Case to object to the allowance of the Bankruptcy Claims (the "**Claim Objection**").[11] In response, Sequitur filed a motion to request that the Bankruptcy Claims and Claim Objection be consolidated with this adversary proceeding for further disposition and trial.[12]  Vista and Maalt agreed to the request.  Therefore, the Court entered an *Agreed Order Granting Sequitur Permian, LLC's Motion to Consolidate Proofs of Claim and the Debtors' Objection Thereto with Existing Adversary Proceeding*, thereby consolidating the Bankruptcy Claims and Claim Objection with this adversary proceeding for all purposes.[13]

During the course of the proceedings, the parties also requested summary judgment on a variety of claims and defenses.  In resolution of the motions, the Court entered the following orders (collectively, the "**Summary Judgment Orders**"): (1) *Order Granting in Part, and Denying in Part, Plaintiff's Second Amended Second Motion for Summary Judgment* (the "**4/13/21 Summary**

---

[10] *See* Docket Nos. 197 and 198 (copies of proofs of claim).

[11] *See* Bankruptcy Case Docket No. 593.

[12] *See* Bankruptcy Case Docket No. 675.

[13] *See* Docket No. 41 (consolidation order); *see also* Bankruptcy Case Docket No. 737 (same).

**Judgment Order**");[14] (2) *Order Granting in Part, and Denying in Part, Defendant's Motion for Summary Judgment* (the "**4/19/21 Summary Judgment Order**");[15] (3) *Order Granting in Part, and Denying Part, Defendant's Motion for Summary Judgment* (the "**4/26/21 Summary Judgment Order**");[16] and *Order Granting in Part, and Denying in Part, Plaintiff's Third Motion for Partial Summary Judgment* (the "**11/05/21 Summary Judgment Order**").[17]  Each of the Summary Judgment Orders is incorporated herein by reference.

Finally, leading up to trial, the parties filed their respective trial briefs and proposed findings of fact and conclusions of law (collectively, the "**Pretrial Filings**"),[18] and the parties filed their joint proposed pretrial order (the "**Pretrial Order**"),[19] which includes joint factual stipulations (the "**Joint Stipulations**"),[20] as supplemented by additional factual stipulations noticed by Maalt and Sequitur (the "**Additional Stipulations**").[21]

### *JURISDICTION*

The Court has jurisdiction of this adversary proceeding, including the Bankruptcy Claims and Claim Objection, pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984). Venue of the proceeding in the Northern District of Texas is proper pursuant to 28 U.S.C. § 1409.

---

[14] Docket No. 122 (resolving the summary judgment motion filed by Plaintiff at Docket No. 60).

[15] Docket No. 126 (resolving the summary judgment motion filed by Defendant at Docket No. 52).

[16] Docket No. 128 (resolving the summary judgment motion filed by Defendant at Docket No. 74).

[17] Docket No. 237 (resolving the summary judgment motion filed by Plaintiff at Docket No. 91).

[18] *See* Docket Nos. 183-187, 189, and 191-192.

[19] Docket No. 190 (the Pretrial Order); *see also* Docket No. 220 (order approving and adopting the Pretrial Order).

[20] *See* Pretrial Order, at pp.13-15 (setting out the parties' Joint Stipulations).

[21] *See* Docket No. 194 (providing notice of the Additional Factual Stipulations).

The adversary proceeding is core in nature under 28 U.S.C. § 157. With respect to the Third-Party Claims, the Counterclaims, the Bankruptcy Claims, and the Claim Objection, the proceeding is core in nature pursuant to 28 U.S.C. § 157(b)(2)(B) because they involve the allowance or disallowance of claims against the bankruptcy estates of Vista and Maalt. With respect to the claims and causes of action asserted by Maalt against Sequitur, because such claims and causes of action will necessarily also be determined in the course of determining the Counterclaims, the Bankruptcy Claim asserted against Maalt, and the Claim Objection in relation thereto, they are also core in nature pursuant to 28 U.S.C. § 157(b)(2)(B). However, even if such claims and causes of action (or any of them) are considered non-core in nature, both Sequitur and Maalt have consented to the Court's entry of a final judgment on such claims and causes of action pursuant to 28 U.S.C. § 157(c)(2).[22]

## FACTUAL BACKGROUND

### A.    The Parties

Vista is a privately owned limited liability company headquartered in Fort Worth, Texas. At all relevant times, Vista's principal business was in producing mine-to-wellhead high-quality, fine-grade frac sand for oil and gas well completion in producing regions in Texas and Oklahoma, including the Permian Basin. Vista's operations were divided into three categories: mining; trucking; and transloading. Vista acquired Maalt for the transloading business.

In 2017, Maalt purchased a transloading facility in Barnhart, Texas from EOG Resources (the "**Barnhart Facility**"). While EOG Resources had previously conducted oil transloading operations at the Barnhart Facility, Maalt updated the facility to handle frac sand transloading. Thus, the then-existing oil gathering infrastructure was removed to accommodate the new use.

---

[22] *See* Docket Nos. 50 and 53 (statements of consent by Maalt and Sequitur).

Later, when the demand for frac sand transloading began to wane for a variety of reasons, Vista and Maalt began to explore the possibility of transforming the Barnhart Facility back into an oil transloading facility.

At all relevant times, Maalt's President and Chief Operating Officer was Martin Robertson ("**Robertson**"), its Vice President of Sales & Marketing was Chris Favors ("**Favors**"), and the head of its logistics team was Jon Ince ("**Ince**").  Vista's President and Chief Operating Officer was Robertson, its Director of Safety and Risk Management was Brian Hecht ("**Hecht**"), and Favors was a member of its business development team.

Separately, at all relevant times, Sequitur was in the crude oil production business, having its primary focus on approximately 88,000 net acres that included acreage in Irion County, Texas as part of the Wolfcamp Shale of the Permian Basin.  Sequitur's operations included a couple of hundred wells within an area of land spanning 400 to 500 square miles within the Permian Basin. Sequitur's Chief Executive Officer was Scott Josey ("**Josey**"), its President and Chief Operating Officer was Mike van den Bold ("**van den Bold**"), its Vice President – Chief Financial Officer was Braden Merrill ("**Merrill**"), one of its Finance Associates was Tony Wroten ("**Wroten**"), and employees within the Health, Safety & Environmental group included Nicholas Eldridge ("**Eldridge**") and Russ Perry ("**Perry**").

**B.**    ***The Arbitrage Opportunity and Interest in the Barnhart Facility***

In and around 2017, the Permian Basin experienced a significant uptick in oil and gas production.  Among other things, major advances in production technology, most notably hydraulic fracturing, had made it possible to exploit mature wells that had previously been shut in as uneconomical.

Eventually, as the ramp-up in production began to outpace existing pipeline capacity, the local spot market for West Texas Intermediate Crude (WTI) began to become depressed in comparison to the pricing achievable elsewhere.[23]  By April 2018, for example, production out of the Permian Basin was trading at a negative $18 per barrel to Cushing, and the Gulf Coast market was maintaining a small premium to Cushing; thus, a roughly $18 per barrel spread could be achieved if sold into the Gulf Coast market instead of locally.[24]  This presented an arbitrage opportunity for any producer or oil trader who could successfully transport oil from the Permian Basin to the Gulf Coast for a cost less than the roughly $18 per barrel spread referenced above.

With the foregoing in mind, in and around April 2018, Sequitur began to explore the possibility of shipping some of its crude by rail to the Gulf Coast to realize on the arbitrage opportunity.[25]  In considering the potential, Sequitur developed a spreadsheet to track the differential in the pricing of futures throughout 2018 and 2019 between WTI Midland/Cushing and Louisiana Light Sweet Crude (LLS) at St. James.  As expected, the spreadsheet reflected favorable futures pricing for the LLS crude during such timeframe.[26]  The ability to realize on the spread, however, was dependent upon successfully lining up all aspects of the logistics – namely, (a) having a point of origin with access to railroad service and sufficient equipment and infrastructure to handle the transloading of crude from truck or pipeline to railcar; (b) having a sufficient number of suitable, regulatory compliant railcars to move the crude by rail; (c) having contracted rail service from point of origin to point of destination; and (d) having a point of destination with sufficient equipment and infrastructure to handle the offloading of the crude from the railcars.

---

[23] *See* Joint Stipulations ¶ 4.

[24] *See* Joint Stipulations ¶ 5.

[25] *See* Joint Stipulations ¶ 6.

[26] *See* Plaintiff Exh. 37.

Sequitur had no prior experience in shipping crude by rail. Thus, realistically it knew that it would either need to obtain some assistance in lining up the logistics on its own or it would need to join forces with another experienced party who could handle the logistics. In the latter case, while such a joint venture partner would reduce risk to Sequitur, it would obviously require Sequitur to share in any arbitrage upside.

Before deciding which direction to go, Sequitur focused on securing a point of origin. In this regard, Sequitur was aware of the Barnhart Facility. It had learned about it back in 2016 when it engaged in a transaction with EOG Resources. The Barnhart Facility was particularly appealing to Sequitur because of its proximity to Sequitur's property. It presented Sequitur with the possibility of eventually running a pipeline from its property to the Barnhart Facility where oil could be gathered for eventual transport, instead of having to transport the oil by truck to the facility.[27]

In early May 2018, Merrill reached out to Vista to inquire about the Barnhart Facility.[28] He was referred to Ince at Maalt. On May 9, 2018, Merrill and Wroten connected with Ince. At that time, Merrill and Wroten provided the outlines of what Sequitur was looking for in terms of oil transloading services and the contemplated length of the agreement, explaining that Sequitur was seeking to procure the services of a terminal for the shipment of Sequitur's crude oil to take advantage of the steep discount on barrels sold in the Midland Basin compared to those sold on the Gulf Coast.[29] Ince similarly provided the outlines of what it would take to convert the facility back into an oil transloading facility, the railcar capacity that it could handle on site, and initial

---

[27] *See* Joint Stipulations ¶ 3.

[28] *See* Additional Stipulations ¶ 3.

[29] *See* Additional Stipulations ¶ 4.

thoughts with respect to the length of an agreement, noting that it would ordinarily look for a longer-term agreement.[30]

Separately, Jupiter MLP ("**Jupiter**") also reached out to Maalt for transloading services connected to the arbitrage opportunity.[31]   Specifically, in late April 2018, Travis Morris ("**Morris**"), Jupiter's Chief Commercial Officer, met and thereafter had follow-up communications with Favors to discuss the possibility of Jupiter obtaining oil transloading services at both the Barnhart Facility and a facility to the west of the Barnhart Facility in Pecos, Texas (the "**Pecos Facility**").[32]   Jupiter represented to Maalt that it already had railcars and rail rates with the railroads lined up and ready to go.

While Maalt expressed interest to Jupiter in moving forward with discussions involving the Pecos Facility, it held off on the Barnhart Facility.   Even though Sequitur did not yet have the logistics lined up on its end and Maalt understood that Sequitur was inexperienced with rail transportation and the securing of railcars to transport crude,[33] Maalt wanted to see where things would go with Sequitur given the proximity of Sequitur's property to the Barnhart Facility and the potential for a longer-term relationship with the installation of pipeline and oil gathering infrastructure.[34]

## C.   *Sequitur Attempts to Line Up the Logistics on Its Own*

Before committing to any type of agreement with Maalt, Sequitur commenced an extensive due diligence review.   Sequitur had an experienced in-house due diligence team for such purpose.

---

[30] *See* Plaintiff Exh. 216 (5/9/2018 correspondence between Sequitur and EnMark in which Sequitur reported on the earlier call with Maalt).

[31] *See* Plaintiff Exh. 1.

[32] *See* Defendant Exh. 2.

[33] *See* Additional Stipulations ¶ 6.

[34] *See* Plaintiff Exh. 3; Defendant Exh. 9.

In addition to having a sophisticated finance and accounting team available to run the oil futures numbers on literally a daily basis to keep tabs on the arbitrage spread and to model out the costs of the project as information became available, Sequitur had between three to seven people in its in-house legal team between 2018 and 2019.  Among other things, Sequitur wanted to ensure that it would be able to line up the logistics down to the Gulf Coast before negotiating an agreement with Maalt.

Initially, Sequitur tried to handle the logistics on its own instead of seeking out a joint venture partner.  According to Merrill, by going it alone Sequitur had the potential to earn as much as a $10 million profit through the arbitrage.[35]  But lining up the logistics would prove to be tricky for two reasons.  First, none of the railroads had a direct connection all the way from the Barnhart Facility to the Gulf Coast.  Instead, it would require two or more carriers to be involved.  Second, the railroad industry was in the midst of a change in the type of railcars that would be required to ship oil, and the demand for such new railcars was outpacing the available supply.

In relation to the first complication (railroad service), the Barnhart Facility had direct access to only one local, short-line railroad – the Texas Pacifico Railroad ("**TXPF**").  TXPF, in turn, had interchange points with other railroads both to the east and the west out of Barnhart.  To the west, TXPF had an interchange point with Union Pacific Railroad ("**Union Pacific**"), a Class 1 railroad.  To the east, TXPF had interchange points with both BNSF Railway ("**BNSF**"), a Class 1 railroad, and Fort Worth & Western Railroad ("**FWWR**"),[36] another short-line, switching railroad which, separately, had interchange points in Fort Worth, Texas with several Class 1

---

[35] *See* Joint Stipulations ¶ 7.

[36] *See* Joint Stipulations ¶ 1.

railroads, including Union Pacific, BNSF, and Kansas City Southern Railroad ("**KCS**").  Each of the Class 1 railroads had rail that connected to the Gulf Coast.[37]

In terms of capacity, at all relevant times, TXPF had enough power to handle up to 90-car trains on its line and could move six to eight 90-car trains per month.  In the case of FWWR, while its tracks could handle 90-car trains, its own locomotives could only handle up to 75-car trains.  Therefore, to move more than 75-car trains on its tracks, it would need a power share or run-through agreement with another railroad having locomotives that could handle the greater than 75-car trains.  Each of Union Pacific, BNSF, and KCS had no problem handling 90-car trains.[38]  In lining up rail service and rates, ordinarily customers would work through the Class 1 carriers who would then coordinate with the relevant short-line carriers to develop an all-in rate.

Turning to the second complication (railcars), in early 2018 the type of railcar predominantly used to transport flammable liquids, such as crude, was the CPC-1232 railcar (a "**1232 railcar**").  While there was a ready supply of 1232 railcars in and around the 2018 time frame, a regulatory shift had been announced to eventually phase out the 1232 railcars in favor of the DOT-117 railcar (a "**117 railcar**"), a safer model of railcar.  Because of the scarcity of new 117 railcars, 1232 railcars could also be retrofit to 117 railcar specifications (a "**117R railcar**").  While the railroads were given a period of years to fully transition to the 117 railcars, some railroads determined to move faster than others.  In early 2018, for example, Union Pacific announced that it was going to go ahead and immediately start requiring 117/117R railcars instead of 1232 railcars for the shipment of crude.  Eventually, BNSF made a similar announcement, but after an accident

---

[37] *See* Joint Stipulations ¶ 2.

[38] In fact, in Union Pacific's case, it had announced that it would be eliminating its manifest commodity shipment service in mid-May 2018 and would only be using unit trains thereafter to ship commodities, such as crude.  *See* Defendant Exh. 1.

in June 2018 involving 117R railcars, it further announced that it would no longer permit 117R railcars – it would require 117 railcars.  KCS, TXPF, and FWWR were continuing to allow 1232 railcars in late 2018 and early 2019.

As previously indicated, Sequitur did not have any prior experience in shipping crude by rail.  Therefore, in advance of Sequitur's outreach to Vista/Maalt, Sequitur contacted EnMark Services, Inc. ("**EnMark**"), a consulting firm in oil and gas marketing, for guidance.  Merrill explained to Spencer Falls ("**Falls**"), EnMark's President, that in conjunction with looking into the possibility of a transloading arrangement involving the Barnhart Facility, Sequitur was in need of specific guidance on how to arrange for rail service for an estimate of 20 railcars per day based upon estimated production of 13,000 barrels per day, with a lead time of roughly three months.[39] Thereafter, following the call among Merrill, Wroten, and Ince on May 9, 2018, Wroten provided an update to EnMark, explaining that it would take approximately 6 weeks to re-outfit the Barnhart Facility for oil transloading, that the Barnhart Facility could accommodate approximately 90 railcars at any given time, and that while Maalt did not typically enter into an agreement with a term shorter than two years, Ince had indicated that Maalt could get comfortable with Sequitur's contemplated September 2018–December 2019 term provided the agreement included a minimum railcar/day commitment.[40]  Wroten requested EnMark to provide a referral to a third party who could manage the logistics for Sequitur and asked EnMark for suggestions on where to take the oil and to whom to sell it.[41]

Separately, understanding that Sequitur had no prior experience in shipping crude by rail, Ince had offered to introduce Merrill and Wroten to one of his contacts at APB, Inc. ("**APB**"), a

---

[39] *See* Plaintiff Exh. 216.

[40] *See also* Defendant Exh. 148 (aerial picture of Barnhart Facility).

[41] *See* Plaintiff Exh. 216.

railcar broker/consulting firm.  Making good on that promise, on May 9, 2018, Ince made an email introduction of Merrill and Wroten to Jonas Struthers ("**Struthers**") at APB.  Ince had previously worked with APB in securing railcars for Maalt and had also found APB to be knowledgeable of the requirements and timing associated with the phase out of the 1232 railcars for 117/117R railcars.[42]  In follow-up to the introduction, APB provided Sequitur with its standard commission agreement[43] and began to immediately provide information to Merrill and Wroten on available railcar sets and the timing of putting in bids.[44]

Separately, Sequitur began to consider railroad options on its own.  In mid-May 2018, for example, Merrill and Wroten opened up a dialogue with BNSF.[45]  While Sequitur was able to provide some detail with respect to the anticipated route (*i.e.*, TXPF would take the cars from Barnhart to the interchange with BNSF, and then BNSF would deliver them to a Valero facility in Port Arthur, Texas) and a range of the number of railcars to be hauled, the discussions lacked definiteness on account of the fact that Sequitur did not yet have agreements in place with Maalt or Valero, did not yet have access to any railcars,[46] and did not have a start date.  Thus, understandably, the discussions stalled out with BNSF.

Ince also provided helpful intel to Merrill and Wroten on possible railroad options.  And, for convenience, he shared an internally developed spreadsheet that could be used to model out logistics pricing, including rail and associated fees and expenses.[47]  Additionally, Ince explained

---

[42] *See* Plaintiff Exh. 2; Defendant Exh. 8.

[43] *See* Plaintiff Exh. 231.

[44] *See, e.g.*, Plaintiff Exhs. 231 and 217.

[45] *See, e.g.*, Plaintiff Exh. 218.

[46] *See, e.g.*, Plaintiff Exh. 231 (follow-up communications with APB with respect to the status of discussions with BNSF and the impact on railcar needs).

[47] *See* Defendant Exh. 12.

that Maalt, itself, could provide third-party logistics support to Sequitur if Sequitur was interested, but Sequitur never asked for a quote and never showed any interest in doing a deal with Maalt on that front.

As Sequitur continued to try to line things up on its own, Jupiter separately continued to pursue a deal with Maalt for both the Pecos Facility and the Barnhart Facility.[48]  In this regard, on May 17, 2018, in an effort to sell Maalt on Jupiter's ability and readiness to go, Morris reported that Jupiter had an agreement with Union Pacific to provide capacity of up to six trains per month out of the Pecos Facility and that it had also obtained the green light from BNSF to take railcars from the Barnhart Facility to the Gulf Coast.[49]  In relation to railcars, Morris represented to Maalt that, through Jupiter's relationship with Equinor, a railcar leasing company, Jupiter had what it needed to get from Barnhart to the Gulf Coast and could get additional railcars if, as, and when needed.

**D.     *Sequitur Pivots to the Pursuit of a Joint Venture Business Model and Communicates Its Continuing Interest in an Agreement with Maalt***

Ultimately, in or around the third week of May 2018, after APB informed Sequitur that it did not have any 117 railcar options available at the time, Sequitur decided to not engage APB and stopped communicating with the firm.  Sequitur decided, instead, to focus its attention on finding a joint venture partner having rail logistics already in place.

In what Merrill described as an "open kimono" discussion with Ince, Merrill disclosed the shift in business plan to Maalt.  Despite the shift, and to evidence the seriousness of Sequitur's continuing interest in doing a deal with Maalt, Merrill agreed to have Sequitur personnel get together with Maalt personnel in Fort Worth, Texas for an in-person "meet and greet" opportunity.

---

[48] *See, e.g.*, Plaintiff Exh. 4; Defendant Exh. 13.

[49] *See* Defendant Exh. 4.

The meeting took place in the latter part of May 2018 and involved roughly 8-10 individuals. Those in attendance generally discussed the transloading business opportunities that existed with use of the Barnhart Facility. However, no specific negotiations took place. The meeting was simply intended to facilitate the establishment of a business relationship among the key operational and financial personnel who would be involved in the event of a deal.

Thereafter, with the assistance of EnMark, Sequitur engaged in communications with several potential JV candidates, including British Petroleum, Valero, Sunoco, NuStar, and Shell.[50] Given Jupiter's interest in the Barnhart Facility and representation to Maalt that it already had rates with BNSF, access to railcars, and an offloading facility on the Gulf Coast, Ince suggested to Merrill that Sequitur should also consider Jupiter. In doing so, Ince told Merrill that Jupiter appeared to be "the real deal" based upon the information that Jupiter had supplied to Maalt. While EnMark encouraged Sequitur to only consider companies with a big balance sheet (which would exclude Jupiter), Sequitur added Jupiter to the mix of possible candidates, albeit more of a backstop option than a primary focus option.

**E.     *Sequitur Enters Into a Letter of Intent with Vista, Begins Making Purchases in Anticipation of an Agreement, and Continues to Pursue a JV Relationship***

By the end of May 2018, Sequitur was reasonably confident that it would be able to both find a reliable JV partner and negotiate an agreement with Maalt. However, it was concerned about the possibility of Vista/Maalt communicating with other potentially interested parties pending the documentation of a deal. Therefore, Sequitur began to negotiate the terms of a Letter of Intent with Vista ("**LOI**") that would, among other things, provide for a period of exclusivity in favor of Sequitur as the parties worked out a definitive agreement.[51] To keep things on track from

---

[50] *See, e.g.,* Plaintiff Exhs. 5 and 34; Defendant Exh. 17.

[51] *See* Plaintiff Exh. 5.

a timeline basis, Sequitur also began to purchase items of equipment for transloading at the Barnhart Facility, figuring that it could resell the equipment later if things failed to come together. For example, Sequitur placed orders for railcar tank vapors, oil storage tanks, and crude oil transloaders.[52]

On June 5, 2018, Vista executed the finalized LOI prepared by Sequitur, dated June 1, 2018.[53]  Pursuant to the LOI, Sequitur evidenced its intent, but not obligation, to have a mutually acceptable definitive agreement finalized by no later than June 26, 2018 (the "**LOI Term**").[54] During the LOI Term, Vista agreed that neither it nor any of its controlled affiliates (including Maalt) would directly or indirectly enter into any agreement with any other person or entity regarding any transaction involving the Barnhart Facility similar to the transaction contemplated, in whole or in part, by Sequitur, and neither Vista nor any of its controlled affiliates would directly or indirectly enter into any negotiations, discussions or agreements with British Petroleum, Valero, Sunoco, NuStar or Shell, the potential JV partners with whom Sequitur was having discussions.[55]

Following execution of the LOI, Sequitur continued to work with potentially interested JV partners on the parameters of an overall deal.[56]  In follow-up to Ince's suggestion to consider Jupiter as well, Favors made an email introduction of Jupiter (Morris) to Sequitur (Merrill) on June 5, 2018.[57]  Later that day, Merrill, Wroten, and Morris got on a phone call to discuss Jupiter's capabilities, at which time Morris personally validated everything that he had previously

---

[52] *See* Plaintiff Exhs. 272 and 273; Defendant Exh. 129

[53] *See* Plaintiff Exh. 6 (executed LOI).

[54] *See* LOI ¶ 2.

[55] *See* LOI ¶ 4.

[56] *See, e.g.*, Defendant Exh. 31.

[57] *See* Plaintiff Exh. 7; Defendant Exh. 24, at p.2.

represented to Maalt, and that Ince and Favors had passed along to Sequitur.[58]  No one from Maalt or Vista was on such call.

As a result of the call, Sequitur agreed to meet with Jupiter at Sequitur's offices in Houston to talk further.  On June 6 or 7, 2018, the meeting took place.  During the course of the meeting, Jupiter again highlighted its capabilities, as indicated above, including that it had railcars that could be moved into place once the Barnhart Facility was ready to go, that it had its own fleet of crude oil trucks that could move the crude from Sequitur's location to the Barnhart Facility, and that it had a downstream market secured at St. James where it was leasing a facility from NuStar and had a market agreement with Shell in play there.  Thus, the parties began to discuss possible terms. Neither Vista nor Maalt had any involvement in the meeting.  Jupiter thereafter communicated the parameters of a potential JV agreement to Sequitur and on June 20, 2018, provided a backup economic analysis of its proposal.[59]  Again, neither Vista nor Maalt had any involvement in their negotiations.

Notwithstanding Jupiter's efforts, based upon EnMark's advice for Sequitur to partner with a producer having a large balance sheet, Sequitur remained focused on doing a deal with a large oil and gas company.  Eventually, Sequitur set its sights exclusively on negotiating an agreement with Shell.  The deal terms being discussed with Shell were similar to those that Jupiter had outlined.

### F.    Maalt Signs a Deal with Jupiter for the Pecos Facility; Jupiter Expresses Continuing Interest in the Barnhart Facility

Separately, Jupiter continued its pursuit of an agreement with Maalt for the Pecos Facility. On June 20, 2018, Maalt and Jupiter entered into a transloading agreement for such location.  And

---

[58] *See* Plaintiff Exh. 46.

[59] *See* Plaintiff Exh. 49; Defendant Exh. 37.

by the end of June 2018, Jupiter was successfully shipping crude out of the Pecos Facility to the Gulf Coast.  In terms of rail service, the railcars were moving from TXPF to Union Pacific to the Gulf Coast.

Once the Pecos Facility was up and running, Jupiter expressed interest to Maalt in resuming its discussions with respect to the Barnhart Facility given the lack of any progress towards an agreement with Sequitur.[60]  In late June 2018, however, Sequitur negotiated an amendment to the LOI to extend the LOI Term to July 6, 2018, which Vista accepted in writing on June 26, 2018.[61] Consequently, neither Vista nor Maalt engaged in any discussions with Jupiter.

### G.      Sequitur and Maalt Reach Agreement on the Terms of a Deal

With the LOI in place, Sequitur and Maalt moved forward with efforts to finalize a definitive agreement.  Separately, Sequitur continued to move forward with its efforts to finalize a definitive JV arrangement with Shell.  On or about July 12, 2018, Vista agreed to a further amendment of the LOI, whereby the LOI Term was extended to July 23, 2018.[62]

As the negotiations continued, the parties simultaneously undertook actions to prepare for the commencement of operations.  Throughout July 2018, for example, steps were taken to obtain a variety of permits that would be required.[63]  Additionally, Maalt entered into a Premises Access Agreement with Sequitur and one of its affiliates to enable Sequitur to commence the construction

---

[60] *See* Plaintiff Exh. 114.

[61] *See* Plaintiff Exh. 6 (Letter of Intent Amendment).

[62] *See id.* (Letter of Intent Amendment No. 2).

[63] *See, e.g.*, Plaintiff Exhs. 251 (Hazardous Materials Certificate of Registration for Registration Years 2018-2019, obtained from the U.S. Department of Transportation), 253 (correspondence between Perry (Sequitur) and William Hess (Ramboll, a consultant retained by Sequitur) with respect to securing an air permit), 252 (Spill Prevention Control & Countermeasures Plan (SPCC) for Barnhart Facility, including engineer certification dated July 25, 2018, under 40 CFR § 112.3(d) (Maalt_000640)).

of its through-put-related facilities at the Barnhart Facility.[64]  Sequitur also obtained approval for

the expenditure of funds needed for the transloading facility buildout.[65]

### H.    The LOI Term Expires, Jupiter Approaches Maalt, and Maalt and Sequitur Enter Into the Terminal Services Agreement

Under the terms of the LOI (as amended), the LOI Term expired on July 24, 2018.  On or

about that same date, van den Bold reported to Favors that Sequitur expected to sign an agreement

with Shell the following week.  Therefore, while the LOI Term was not extended further, Maalt

continued to operate under the belief that a finalized transloading agreement would be coming

together with Sequitur, particularly in light of the fact that Sequitur had already started to purchase

oil transloading equipment.

That said, given the expiration of the exclusivity provisions of the LOI, when Jupiter again

approached Maalt with a proposal for use of the Barnhart Facility, Maalt listened.  This time,

Jupiter proposed a deal whereby it would agree to make an upfront $8 million payment to Maalt

in order to get the relationship off the ground.  In connection with the offer, Jupiter indicated that

it was ready to immediately sign an agreement and to start moving crude.  Having an alternative

proposal in hand from Jupiter, the leadership of Maalt became anxious to get a deal done with

Sequitur or move on to Jupiter.  While Maalt had reached agreement with Sequitur on a finalized

form of definitive agreement, Sequitur had not yet agreed to sign the agreement.

Consequently, on August 3, 2018, Favors sent an email to van den Bold and Merrill to let

them know that Maalt had received a competing bid for the Barnhart Facility from Jupiter and that,

while he preferred to do a deal with Sequitur – even in the face of ostensibly better financial terms

---

[64] *See* Joint Stipulations ¶ 8; Plaintiff Exh. 132.

[65] *See* Plaintiff Exh. 271 (AFE for expenditures contemplated for the first phase of the buildout).

from Jupiter – he was getting a lot of internal pressure to get a deal done, one way or the other.[66]

Later that evening, on August 3, 2018, Merrill called Favors to follow up on the earlier correspondence.  He explained that Sequitur was having trouble getting a deal done with Shell.  Hearing this, Favors suggested that Sequitur might want to consider going with Jupiter instead, given that Jupiter had indicated that it was ready to go and already had rail rates and railcars lined up.  Favors alternatively suggested the possibility of a three-way deal among Sequitur, Shell and Jupiter.  In fact, because Morris was going to be in Fort Worth on August 7, 2018, for a meeting in relation to the Pecos Facility, Favors indicated that he could arrange for a group meeting that included Jupiter, if Merrill was open to the idea.  In making these suggestions, Favors genuinely believed that Jupiter did, in fact, have rates and railcars ready to go.  After all, Jupiter was already shipping crude out of the Pecos Facility.

Ultimately, Merrill indicated that Sequitur was going to continue to stick with Shell for at least one more week before considering any alternatives.  That said, to hedge against the possibility of a Shell deal not coming together, Merrill separately contacted Morris to confirm with him, directly, that Jupiter was, in fact, ready to go with rates and railcars.  Morris confirmed the same.  Thus, having confidence that Sequitur had an alternative game plan if the Shell deal fell apart, Merrill informed Favors that Sequitur was willing to go forward with the signing of the definitive agreement.  Accordingly, the parties made plans to meet in Fort Worth on August 7, 2018, to sign the agreement and have an initial post-signing planning meeting.

As a result of this development, Maalt formally rejected the Jupiter offer.  In doing so, however, Favors suggested that Morris stick around after the Pecos Facility meeting for the

---

[66] *See* Plaintiff Exh. 15; Defendant Exh. 47.

possibility of a joint meeting with Sequitur in furtherance of a potential Sequitur-Jupiter JV arrangement.[67]

On August 7, 2018, Sequitur and Maalt met in Maalt's Fort Worth offices to execute the definitive agreement – the Terminal Services Agreement, effective August 6, 2018 (the "**TSA**" or "**Agreement**").[68]  Following the signing, personnel of Sequitur and Maalt got together for lunch in town and Morris was invited to tag along.  At that time, Merrill reiterated to Favors that Sequitur was going to stick with its plan to pursue an agreement with Shell for at least one more week before pivoting to Jupiter or anyone else.

## I.    *Key Provision of the Terminal Services Agreement*

The following provisions of the TSA are important to highlight given their relevance to the dispute in this case:[69]

### 1.    *Time-Related Definitions*

Article 1 of the TSA includes the following time-related definitions:

"***Calendar Quarter***": A period of three consecutive months beginning on the first day of each January, April, July and October (except that for 2018, September would be included in the October-December 2018 Calendar Quarter).

"***Effective Date***": August 6, 2018.

"***Target Terminal Operations Commencement Date***": September 1, 2018, unless extended by mutual agreement in writing by the Parties and subject to the force majeure provision of article 14.

"***Terminal Operations Commencement Date***": The date that the Terminal is fully operational to enable the performance and receipt of the Services and any and all Regulatory Approvals for the Services have been obtained, in each case, as reasonably determined by Sequitur and as such date is evidenced by a written notice sent by Sequitur to Maalt.

---

[67] *See* Defendant Exh. 120.

[68] *See* Plaintiff Exh. 13 (TSA); *see also* Joint Stipulations ¶ 9.

[69] For purposes of such descriptions, any capitalized term that is not defined in the descriptions is a term that is defined within Article 1 of the TSA.

Separately, § 8.1 of the TSA specifies that the "***Term***" of the TSA is from the Effective Date (August 6, 2018) until January 1, 2020 (the "Initial Term"), subject to Sequitur's right to renew and extend the term for one or more successive three-month periods (each an "Extended Term") by written notice to Maalt at least sixty days prior to the expiration of the Initial Term and any Extended Term, and subject to earlier termination under the provisions of Article 8 of the TSA.[70]  Certain of the early termination provisions of Article 8 are discussed separately below.

### 2. *Maalt's Promised Provision of Transloading Services and Sequitur's Right to Exclusive Use of the Barnhart Facility During the Term*

"***Services***" is defined in § 2.2 of the TSA.  Pursuant to § 2.2 of the TSA, **Maalt** agreed to receive, load, unload, handle, measure, and redeliver Product at the Terminal in accordance with Sequitur's Forecasts and reasonable requirements and to tender such Product to Sequitur or its third-party customer's carriers as directed by Sequitur, in each case, in accordance with the terms and conditions of the Agreement.  In providing such Services, **Maalt** agreed to furnish and be responsible for all labor, supervision, and materials necessary for its timely and efficient performance of the receipt, loading, unloading, transloading, handling, measuring, redelivery, and related operations and services pursuant to the Agreement and contemplated under the Agreement in order to provide the Services, which in all cases were required to be conducted in accordance with generally accepted oil terminalling practices, in a good and workmanlike manner and in compliance with all Applicable Law and the obligations of Maalt to its surface lessors.  **Maalt** further agreed to operate and maintain the Terminal and any other related equipment and property in good and safe condition at all times.[71]

---

[70] *See* TSA § 8.1.

[71] *See* TSA § 2.2.

Pursuant to § 2.3 of the TSA, **Maalt** additionally agreed that, during the Term: Sequitur would have the exclusive right to use the Terminal for Product transloading; Sequitur would be entitled to utilize 100% of the capacity of the Terminal if required for the transloading of Product; Maalt would be precluded from contracting with any other Person (including any of its Affiliates) for capacity at the Terminal, to provide services at the Terminal to any other Person, or to develop any additional terminal facilities on the Terminal's land for the transloading of Product, without Sequitur's prior written consent; Maalt would be required to limit the use of the areas of the Terminal designated for the transloading of Product to the sole and exclusive purpose of loading and unloading the Product; and Maalt would be precluded from entering into any agreement with any Third Party for the transloading of oil or other hydrocarbon products at the Terminal.[72]

### 3.    _Sequitur's Promise to Pay and Minimum Throughput Obligation_

Pursuant to § 4.1 of the TSA, **Sequitur** agreed to pay to Maalt a throughput fee equal to $1.50 per Barrell of Product Throughput through the Terminal (defined as the "**Throughput Fee**").[73]

Additionally, pursuant to § 3.1 of the TSA, and subject to other terms of the Agreement, expressly including § 3.3 (setting out provisions on how to address partial Calendar Quarters)[74] and Force Majeure (discussed below), for each Calendar Quarter from and after the Terminal Operations Commencement Date, **Sequitur** agreed to Throughput (either directly or via volumes

---

[72] See TSA § 2.3.

[73] See TSA § 4.1.

[74] Pursuant to § 3.3 of the TSA, for any partial Calendar Quarter within the Term, the Minimum Volume Commitment is to be prorated accordingly.  Additionally, the Minimum Volume Commitment for the applicable Calendar Quarter is to also be adjusted downward on a per Barrell basis for any volumes of Product that Sequitur was not able to Throughput through the Terminal due to Maalt's failure to receive Product within the capacity of the Terminal, Maalt's breach of the Agreement, or any other act or an omission of Maalt that prevents or curtails Throughput.  See TSA § 3.3.

delivered to the Terminal by Sequitur's third-party customers) an amount of Product through the Terminal on a Monthly basis equal to a minimum of 11,424 Barrells per Day (defined as the "**Minimum Volume Commitment**") during each Calendar Quarter during the Term after the Terminal Operations Commencement Date,[75] or otherwise pay the Shortfall Payment applicable to such Calendar Quarter.[76]  Pursuant to § 3.2 of the TSA, if, for any Calendar Quarter after the Terminal Operations Commencement Date, the volume of Product actually Throughput during such Calendar Quarter (calculated on a Calendar Quarterly basis) was less than the Minimum Volume Commitment (such deficiency, if any, the "**Shortfall**"), **Sequitur** agreed to pay to Maalt an amount equal to the volume of the Shortfall (expressed in Barrells) to the extent not caused or contributed to by Force Majeure, maintenance outages at the Terminal, or Maalt's breach of its obligations under the Agreement, multiplied by the Throughput Fee in effect for such Calendar Quarter (collectively, defined as the "**Shortfall Payment**").[77]  In regards to timing, the Parties agreed that, promptly following the end of each Calendar Quarter, Maalt would provide to Sequitur a written statement showing the Minimum Volume Commitment versus the Actual Quarterly Aggregate Volume.  And if the Actual Quarterly Aggregate Volume was less than the Minimum Volume Commitment for such Calendar Quarter, **Sequitur** would owe to Maalt the Shortfall Payment calculated per § 3.2 for the applicable Calendar Quarter.[78]

Finally, pursuant to § 4.2 of the TSA, the due date for each invoice issued by Maalt in accordance with the Agreement was 30 days after Sequitur's receipt of the invoice, and pursuant

---

[75] Technically, the Agreement refers to the "Termination Operations Commencement Date" instead of the "Terminal Operations Commencement Date."  However, "Termination Operations Commencement Date" is nowhere defined within the Agreement and, in context, it is clear that the Parties intended to refer to the "Terminal Operations Commencement Date."

[76] *See* TSA § 3.1.

[77] *See* TSA § 3.2(a).

[78] *See* TSA § 3.2(b).

to § 4.3 of the TSA, **Sequitur** agreed that any amount payable by Sequitur under the Agreement shall, if not paid when due, bear interest at the contractual Interest Rate from the payment due date until paid.[79]

### 4.    *Conditions Precedent to the Terminal Operations Commencement Date*

As indicated above, the Terminal Operations Commencement Date is dependent upon the Terminal being fully operational to enable the performance and receipt of the Services and any and all Regulatory Approvals for the Services having been obtained, in each case as reasonably determined by Sequitur.[80]

(a) *Fully Operational Terminal*.  In relation to the requirement that the Terminal be fully operational to enable the performance and receipt of the Services, § 2.7 of the TSA required **Sequitur** to undertake the following Phase I Project expansions/alterations to the Terminal[81] at Sequitur's sole cost and expense: the installation of equipment and facilities at the Terminal necessary for the loading of railcars with Product from trucks, "such that the loading will commence on the Target Terminal Operations Commencement Date" (such equipment and facilities referred to herein as the "**Phase I Infrastructure**").[82]  Exhibit B of the TSA specifically identifies the Phase I Infrastructure required to be installed by **Sequitur**: (i) vent line for connection to trucks and railcars (and easement from University Lands for the vent lines); (ii) flare

---

[79] *See* TSA §§ 4.2 and 4.3; *see also* TSA art. 1 ("Interest Rate" defined as "an annual rate (based on a three-hundred-sixty (360) Day year) equal to the lesser of (a) two percent (2%) over the prime rate as published under 'Money Rates' in the *Wall Street Journal* in effect at the close of the Business Day on which payment was due and (b) the maximum rate permitted by Applicable Law").

[80] The definition also refers to the provision of a written notice by Sequitur to Maalt of the date of the Terminal Operations Commencement Date.  For reasons set forth in the 4/13/21 Summary Judgment Order, the Court found the written notice requirement to be a covenant as opposed to an independent condition precedent to the occurrence of the Terminal Operations Commencement Date.  *See* 4/13/21 Summary Judgment Order.

[81] The TSA also provided Sequitur with the *right*, but not the *obligation*, to install additional equipment and facilities necessary for the loading of railcars from pipelines (referred to as the Phase II Project).  *See* TSA § 2.7 and Exhibit C.

[82] *See* TSA § 2.7.

facility (including a flare, separator and a tank) connected to vent lines for gaseous hydrocarbon byproduct; (iii) transloaders sufficient to transfer Product from Trucks onto railcars; (iv) hoses, valves and fittings to connect vent lines to trucks, railcars, and flare; and (v) fire extinguishers at manifolds.[83]

(b) _Regulatory Approvals_.   Separately, in relation to the requirement that any and all Regulatory Approvals for the Services be obtained, the TSA defines "**Regulatory Approvals**" as any Permit from a Governmental Authority necessary for performance of the Services or the installation of equipment at or operations of the Terminal in connection with the Services, including the following Permits: (1) Spill Prevention, Control, and Countermeasure (SPCC) plan permit; (2) Storm Water Permit issued by the Texas Commission on Environmental Quality (TCEQ); and (3) Permit by Rule (PBR) Air Permit issued by the TCEQ.[84]  "**Permits**" is defined as permits, licenses, consents, clearances, certificates, approvals, authorizations or similar documents or authorities required by any Governmental Authority or pursuant to any Applicable Law and that apply to the Terminal, the Services or a Party.  Pursuant to § 6.5 of the TSA, **Maalt** was required to obtain all Permits.[85]  Overall, however, § 2.1 of the TSA required the Parties to work together in good faith (and at their own cost and expense) to obtain the Regulatory Approvals as provided in the Agreement prior to the Target Terminal Operations Commencement Date.[86]

---

[83] _See_ TSA § 2.7 and Exhibit B (additionally specifying that, during the Term, Maalt shall not be required to make any capital investment to facilitate the Services (outside of any necessary maintenance or repair _following_ the commencement of operations)).

[84] _See_ TSA, Art. 1 (definitions of "Permits" and "Regulatory Approval").

[85] _See_ TSA § 6.5.

[86] _See_ TSA § 2.1.

5.     _Force Majeure Provision_

Given Maalt's inclusion of the Minimum Throughput Obligation in the TSA, Sequitur

required the inclusion of a contractual force majeure provision as well, specifying that "[e]xcept

for [Sequitur's] obligation to pay [Maalt] the monetary amounts provided for in Article 4 of this

Agreement for Product actually Throughput at the Terminal, neither Party shall be liable to the

other for any failure, delay, or omission in the performance of its obligations under this Agreement,

or be liable for damages, for so long as and to the extent such failure, delay, omission, or damage

arises directly or indirectly from a Force Majeure occurrence…."[87]

Pursuant to § 14.2 of the TSA, a "**Force Majeure Event**" or "**Force Majeure**" is defined

as "any cause not within the reasonable control of a Party claiming suspension, and that could not

have been avoided or overcome by the exercise of due diligence by such Party…."[88]  As relevant

to the dispute in this case, § 14.2 goes on to include as an example "the unavailability, interruption,

delay or curtailment of Product transportation services."[89]  "Product transportation services" is not

defined.

Pursuant to § 14.3 of the TSA, in the event that either party found it necessary to declare

Force Majeure under the Agreement, then as soon as reasonably possible after the occurrence of

Force Majeure, such party was required to immediately notify the other party of the same, first by

telephone or email, and then promptly by mail or overnight express courier, "giving reasonably

full details of such occurrence and its estimated duration."[90]  Thereafter, the party affected by the

Force Majeure was required to use commercially reasonable efforts to remedy the Force Majeure

---

[87] _See_ TSA § 14.1.

[88] _See_ TSA § 14.2.

[89] _See id._

[90] _See_ TSA § 14.3.

condition with all reasonable dispatch, if the affected party deemed it reasonable and economic to do so, and to resume performance of any suspended obligations upon termination of the Force Majeure condition; provided that the Term of the Agreement would not be extended by the period of the Force Majeure delay.[91]

### 6.   *Remedies for Default*

Pursuant to § 8.3 of the TSA, the parties agreed that, except as otherwise specifically provided for under the terms of the Agreement, if either party had failed to perform in any material respect, then the party to whom such performance was owed was given the right to notify in writing the defaulting party, stating specifically the nature of the default.  The defaulting party was then given 30 days after receipt of the default notice to cure the default, provide adequate security satisfactory to the non-defaulting party to fully indemnify the non-defaulting party for any and all consequences of the breach, or provide notice of its good faith dispute of the claim of default.  If the defaulting party failed to timely cure or provide adequate security, then, without prejudice to its other remedies under the Agreement or at law or in equity, the non-defaulting party had the right to suspend the performance of its obligations under the Agreement or terminate the Agreement by providing written notice of the same to the defaulting party.[92]

Additionally, pursuant to § 15.19 of the TSA, the parties agreed that in the event of litigation, the prevailing party in the dispute would be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of the prevailing party under or with respect to the Agreement, including, without limitation, reasonable fees and expenses of attorneys and accountants.

---

[91] *See* TSA §§ 14.1 and 14.3.

[92] *See* TSA § 8.3.

7.     *__Termination Rights__*

Pursuant to Article 8 of the TSA, the parties were granted the following termination rights:

(a) *__Failure of Conditions__*.  First, pursuant to § 8.2 of the TSA, the parties were granted the right, respectively, to terminate the Agreement, in writing, at any time prior to the Target Terminal Operations Commencement Date, in the event of the failure of the other party to satisfy specified conditions.[93]   Among the conditions specified in relation to Maalt was the obtaining of all necessary Regulatory Approvals and the effectiveness of the same,[94] and the adoption of an SPCC plan for the Terminal reasonably satisfactory to Sequitur (and any other relevant Customer Parties), the provision to Sequitur (and such other Customer Parties), upon request, all HSE and related documentation, and the maintenance of practices necessary for Sequitur to obtain the Customer Parties' approval of use of the Terminal (if relevant).[95]

(b) *__Default__*.  Second, as indicated above, each of the parties was granted the right under the terms of § 8.3 of the TSA to terminate the Agreement in the event of the other party's uncured default.[96]

(c) *__Continuing Force Majeure__*.  Finally, pursuant to § 8.4 of the TSA, each of the parties was granted the right to terminate the Agreement, in writing, in the event of the parties' inability to fulfill the purposes of the Agreement due to Force Majeure for a period equal to or greater than 60 consecutive days or 60 days in any 120-day consecutive day period.[97]

---

[93] *See* TSA §§ 8.2(a) (early termination right in favor of Sequitur) and 8.2(b) (early termination right in favor of Maalt).

[94] *See* TSA § 8.2(a)(iii).

[95] *See* TSA § 8.2(a)(v).

[96] *See* TSA § 8.3.

[97] *See* TSA § 8.4.

**J.      The Parties Work Towards the Terminal Operations Commencement Date;**
**Sequitur Abandons the Pursuit of a Deal with Shell and Begins to Pursue**
**A Deal with Jupiter**

As reflected above, the triggering of the Terminal Operations Commencement Date was dependent upon the securing of all Regulatory Approvals, including specified Permits, and the Terminal (with the Phase I Infrastructure complete/installed) being fully operational to enable the performance and receipt of the Services.  On Maalt's end, Hecht was responsible for running point on the satisfaction of all necessary health, safety, security, and environmental (HSE or HSSE) requirements.  On Sequitur's end, Eldrige was responsible for running point on ensuring that the necessary Phase I Infrastructure items were acquired and installed and Perry was responsible for running point on the satisfaction of HSE requirements.

With the foregoing in mind, even before the TSA was executed, Maalt began the process of securing permits and approvals.[98]  By July 1, 2018, for example, Maalt had obtained a Hazardous Materials Certificate of Registration from the U.S. Department of Transportation.[99] And prior to the end of July 2018, Hecht had circulated the Spill Prevention, Control, and Countermeasure (SPCC) and Storm Water Pollution Prevention (SWPP) plan permits to Sequitur.[100]  Then, following execution of the TSA, Maalt and Sequitur conducted regular group meetings for the purpose of addressing and coordinating on the completion of outstanding equipment installment and HSE matters.  Among other things, for example, Hecht and Perry, along

---

[98] *See, e.g.*, Plaintiff Exh. 3 (5/11/2018 correspondence from Hecht to Maalt team with respect to permitting efforts underway and projected timeline for obtaining all required permits).

[99] *See* Plaintiff Exh. 251.

[100] *See* Plaintiff Exhs. 252 and 259.  Hecht testified at trial that, while the SWPP permit was set to expire at the end of August 2018, the permit was renewed in August 2018 and a copy of the renewal was provided to Sequitur as well.

with the respective outside consultants retained by Maalt and Sequitur, collaborated on the preparation and obtaining of the Permit by Rule (PBR) Air Permit.[101]

While things were moving along fine towards the satisfaction of TSA requirements, one of the complications that Sequitur was facing in finalizing an agreement with Shell was the inordinate number of onerous HSE requirements that Shell was independently imposing as part of *its* tentative deal with Sequitur.[102]    Ultimately, facing a September 1, 2018 Target Terminal Operations Commencement Date and not having an executed agreement with Shell in place by August 16, 2018, Sequitur determined to shut down efforts with Shell and pivot to Jupiter.  As a result, starting on August 17, 2018, Sequitur commenced negotiations with Jupiter and brought its consultant, EnMark, back into the loop for guidance.[103]  Sequitur also began to invite Jupiter to the Sequitur-Maalt progress meetings.

With guidance from EnMark, Sequitur required additional credit support from Jupiter as a means to hedge against the credit risk of doing a deal with a smaller company.  Jupiter agreed to provide such credit support in the form of a credit sleeve that it would obtain from Macquarie.  Thus, with that out of the way, Sequitur and Jupiter reached an agreement in principal on a deal that could be broken down into two phases: phase one would involve Jupiter's trucking of oil from Sequitur's property to the Barnhart Facility for a trucking fee; and then phase two would involve the sale of the oil backed by the Macquarie credit sleeve and transport of the oil by rail to the Gulf Coast, with Sequitur and Jupiter to split the realized arbitration profit after costs.

---

[101] *See* Plaintiff Exhs. 250, 254, 255 and 260.  Hecht confirmed in testimony that the permit was obtained.

[102] *See, e.g.*, Defendant Exh. 52 (Shell's HSSE review and gap assessment); Defendant Exh. 52a (correspondence between Perry and Shell personnel relating to Shell's HSSE review/assessment).

[103] *See* Plaintiff Exh. 56.

As a result of the shift to Jupiter and the then-status of completing installation of the Phase I Infrastructure, the parties were not ready to go by the Target Terminal Operations Commencement Date. At that point, it appeared as though the operations would likely commence at some point in October 2018. In furtherance of such objective, while Sequitur initially asserted that it was going to continue to work towards the satisfaction of all of Shell's onerous HSE requirements,[104] eventually Sequitur backed off of the non-contractual, Shell-imposed requirements and by October 18, 2018, Merril noted that all of the HSE requirements under the TSA had been completed with everything in its INS system other than insurance documentation. With respect to the insurance documentation, Hecht confirmed that it had been provided to the Sequitur Drop Box account set up to receive such documentation.[105]

### K.    *Jupiter's Disastrous Test Train Set Run; Sequitur Considers an Alternative Deal with Murex*

As of September 2018, Jupiter had four railcar sets at its disposal through Equinor. They were being utilized in connection with the shipment of crude from the Pecos Facility. Based upon its relationship with Equinor, Jupiter believed that it could obtain additional railcars for exclusive use in shipping crude from the Barnhart Facility if and when needed. In the event of any problem or delay in obtaining the railcars, however, Jupiter believed that it could simply split time between the Pecos Facility and Barnhart Facility with its existing railcars.

On September 13, 2018, Merrill circulated a revised definitive JV agreement (a buy/sell agreement) to Jupiter.[106] Despite finalization of the agreement, Sequitur made it clear that it would not be signing the agreement until Jupiter had demonstrated its ability to deliver railcars to the

---

[104] *See* Defendant Exh. 52a (email from Perry indicating an intention to continue to proceed with the Shell HSSE requirements).

[105] *See* Plaintiff Exh. 61.

[106] *See* Plaintiff Exh. 60.

Barnhart Facility.[107]    Because that had not yet occurred by the end of September 2018, the commencement of operations in October 2018 was becoming doubtful.  In terms of railroad options, Jupiter focused on moving the crude to the east out of Barnhart, with BNSF and KCS as its Class 1 railroad candidates.

In the case of KCS, KCS could take the trains to Kansas City, interchange there with Norfolk Southern, and then Norfolk Southern could take the trains to Meridian, Mississippi. Another option would be to have KCS run the trains to East St. Louis, interchange there with CSX Transportation ("**CSX**"), and then have CSX take the trains on to a buyer destination point.  With those options in mind, on or about October 4, 2018, Equinor (as Jupiter's exclusive railcar provider) began to engage in a series of communications with KCS (through Josh Monroe ("**Monroe**")) about potential rail business out of Barnhart.[108]  While KCS did not have a run-through agreement with TXPF at the time to permit KCS to haul 90-car trains over its tracks, Monroe explained that 75-car trains could be run out of Barnhart with no problem.  Plus, he explained that he believed that KCS could get a power share agreement in place by the end of October 2018 which would enable KCS to take the 90-car trains the whole way.[109]  On October 7, 2018, KCS provided a ballpark rate to Equinor with respect to the route to Kansas City.[110] Thereafter, on October 19, 2018, Monroe provided additional intel on how the rate would differ going to East St. Louis.[111]  In conjunction with those communications, Equinor also inquired into

---

[107] Around this same time frame, EnMark passed along to Merrill and Wroten unsolicited marketing information that it had received from Railcar Leasing with respect to the availability of approximately 94 railcars.  *See* Plaintiff Exh. 58.  Curiously, Sequitur neither followed up on the lead nor passed it on to Jupiter.

[108] *See, e.g,* Defendant Exh. 123.

[109] *See* Defendant Exh. 123.

[110] *See* Defendant Exh. 123.

[111] *See* Defendant Exh. 123.

the possibility of a test run.  While KCS was not opposed to the concept, Monroe explained that it would take some time to line something like that up.[112]

Jupiter, however, needed a test run sooner so that it could get the Sequitur-Jupiter agreement executed.  Consequently, at or around the same time in October 2018, Jupiter instructed Union Pacific (the Class 1 railroad that Jupiter was using to ship oil from the Pecos Facility) to redirect one of its returning train sets to the Barnhart Facility coming from the east.  Because Union Pacific did not have a run-through agreement with FWWR, Jupiter sought to have Union Pacific bypass FWWR and connect directly with TXPF at one of the east junctions where Jupiter believed that both Union Pacific and TXPF had an active interchange point.  However, Jupiter was mistaken and the railcars effectively became stranded.  Not only did this create concern at Sequitur, it created friction with Equinor, who had supplied the railcars to Jupiter.  Thus, Jupiter promptly redirected the train set back to the Pecos Facility and decided to try again with a second train set to be taken to TXPF utilizing a BNSF route.[113]  Jupiter's back-up plan was also a bust.  Because BNSF did not have a run-through agreement with either Union Pacific or TXPF, it refused to allow Union Pacific to move the train set over its tracks.[114]  Once again, this created friction with Equinor, who had supplied the railcars.  Thus, Jupiter promptly redirected the train set to the Pecos Facility and put matters on hold until a run-through agreement could be worked out among Union Pacific, FWWR, and TXPF or among Union Pacific, BNSF, and TXPF.[115]  Correspondingly, Equinor terminated its discussions with KCS.

---

[112] *See* Defendant Exh. 123.

[113] *See* Plaintiff Exh. 17.

[114] *See* Plaintiff Exh. 18.

[115] *See* Defendant Exh. 70.

By this point, Sequitur was beginning to have serious doubts about Jupiter's ability to perform. Consequently, Sequitur began to explore other options. In doing so, Sequitur enlisted the assistance of American Shipping & Trading, LLC ("**AST**") (through Dion Nicely ("**Nicely**")). Ironically, on or about November 1, 2018, Nicely also reached out to KCS for a rate that would involve the interchange with Norfolk Southern. He had managed to do some advance groundwork with TXPF (through Stan Meador ("**Meador**"), TXPF's Vice President of Sales and Marketing), to confirm that TXPF could accommodate at least one 90-car train per week over its tracks and was open to putting in place a power share agreement with KCS. That said, when KCS later provided a ballpark rate to AST, Nicely concluded that the rate would be too high for Sequitur – Sequitur would end up losing money. Consequently, Nicely reached out to TXPF in an effort to try to get TXPF to work on lowering the rate with KCS. He was unsuccessful.[116] Thus, after informing Monroe on November 6, 2018, that the KCS rate was just too high and not obtaining any accommodation, Nicely stopped communicating with Monroe and no further communications took place between AST and KCS.

In the midst of these developments, Collin Johansen ("**Johansen**"), a Sequitur accounting employee, was fortuitously introduced to Robert Wright ("**Wright**"), the then-Vice President of Crude Oil Trading for Murex Ltd. ("**Murex**"), at a baby shower. Murex, a midstream marketing-trading/logistics company, could potentially fill the gap. Johansen explained the challenges that Sequitur was facing and provided Merrill's contact information to Wright if he believed that Murex could assist.

---

[116] *See, e.g.*, Plaintiff Exh. 161.

Believing that Murex could, in fact, present a solution, on November 5, 2018, Wright sent an email to Merrill to propose a call to discuss Murex's capabilities.[117]  Merrill welcomed the possibility, proposing a call for November 6, 2018.  He requested that Wright circulate background information about Merex's capabilities in advance of the call.  Accordingly, on November 6, 2018, Wright sent a follow-up email to Merrill to explain that Murex owned and controlled just under 4,000 railcars and owned a crude oil offloading terminal in New Orleans, Louisiana, referred to as the Gulf Gateway Terminal.[118]

Later that day, Wright had a call with Merrill and Wroten.  During the call, Wright reconfirmed the railcar and terminal information that he had supplied and further explained that roughly 75% of Murex's railcar fleet were 117 railcars, that there were six different Class 1 railroads that could get to the Gulf Gateway Terminal, that Murex had existing agreements in place with BNSF and Union Pacific, and that he believed that Merex could negotiate a rate with KCS in less than five days if Sequitur desired to go with KCS.[119]  At the conclusion of the call, a lunch meeting was set up for the following week.

Meanwhile, back on the Jupiter front, on November 8, 2018, in connection with a report to Maalt on the Pecos Facility, Morris informed Ince that Equinor was giving Jupiter "heartburn" with respect to its railcars on account of the stranded train sets.[120]  Ince suggested to Morris that he should consider reaching out to APB, as it was his understanding that APB had a lead on some 117 railcars.  Morris followed up on the suggestion and connected with Struthers at APB later that day.  Struthers informed Morris that APB had an opportunity available, but that it would require a

---

[117] *See* Defendant Exh. 156.

[118] *See* Plaintiff Exh. 63.

[119] *See* Plaintiff Exhs. 64 and 65 (Merrill and Wroten notes from the call).

[120] *See* Defendant Exh. 90.

$5 million up-front, non-refundable commission just to put Jupiter into the bidding mix with the leasing party.[121]  While Morris pursued the matter internally within Jupiter and continued to communicate with Struthers over the next several days, ultimately Jupiter did not act on the opportunity and nothing came of it.  Shortly thereafter, Equinor terminated Jupiter's usage of all four train sets based upon the stranded train set debacle and the lack of any confidence in a deal involving the Barnhart Facility coming together.

Returning to Murex, on November 12, 2018, Merrill and Wroten attended the planned lunch meeting with Wright.  At the meeting, Merrill explained what Sequitur was attempting to do in terms of moving crude from the Barnhart Facility to the Gulf Coast and described the troubles that it had been encountering.  Wright again explained Murex's capabilities.  In doing so, Wright acknowledged that Murex's existing fleet of railcars was currently in use, but that he believed that Murex would have the necessary railcars when needed.  He also acknowledged that the Gulf Gateway Terminal was currently at full capacity, but that Murex could make capacity.  For example, certain of the existing traffic could be redirected to other terminal options in order to make room at the Gulf Gateway Terminal.  Another possible option would be for Murex to take the crude even further to the Nustar Terminal at St. James (the terminal controlled by Jupiter) – but it would cost more.  Ultimately, by the end of the lunch, Wright provided a ballpark, indicative price per barrel off of LLS rate that Murex would likely charge for a two-year term agreement.  Merrill was not enthusiastic about the rate.  Additionally, he explained that Sequitur would be looking for a 12-month term instead of a two-year term.  Consequently, Wright indicated that he would double-check on the pricing and get back to them.

---

[121] *See* Plaintiff Exh. 22.

Thereafter, on November 28, 2018, Wright sent a follow-up email to Merrill and Wrotten. In the email, he confirmed that the indicative price estimate provided at lunch was accurate for a two-year deal, but that because Sequitur was looking for only a 12-month agreement instead of a two-year agreement, the cost structure would be higher to account for the other longer term competing crude by rail opportunities that Murex would have to forego in doing a deal with Sequitur.[122] Wright asked Merrill and Wroten to let him know if they wished to continue discussing terms. While Merrill indicated that they would get back to him shortly, nothing further came of it. Because the price would only go up for a one-year deal in order to outbid other competing opportunities, the negotiations fell apart and no further communications took place between the parties.

Separately, on November 29, 2018, Morris reached out to Merrill to let him know that he was close to lining up transportation via KCS and Union Pacific with an expectation to have 117R railcars sourced by another leasing company within five to ten days.[123] By this point, however, Sequitur had lost all faith in Jupiter and those communications also fell apart.

## L.    *Sequitur Panics and Declares an Event of Force Majeure*

In the midst of the foregoing developments, Sequitur had been continuing to plow forward in completing the installation of the Phase I Infrastructure. According to a November 27, 2018, internal Sequitur weekly status report, the project was 99% complete.[124] Thus, given the proximity to completion and the lack of a definitive agreement in place with any JV partner, any railroad, or

---

[122] *See* Plaintiff Exh. 67; Defendant Exh. 98.

[123] *See* Plaintiff Exh. 128.

[124] *See* Plaintiff Exh. 73. The report also specified that the optional Phase II oil gathering facility project was 65% complete. Importantly, the triggering of the Terminal Operations Commencement Date was tied to the Phase I railyard project, not the optional Phase II oil gathering facility project.

any railcar provider, Sequitur panicked.  In early December 2018, Merrill had a discussion with Favors about status.  He explained that nothing was coming together as hoped.

In an effort to try to help, Favors told Merrill that Vista had another potential purchaser/rail logistics provider that it could introduce to Sequitur.  Before that could occur, however, Sequitur sent a letter to Maalt, dated December 7, 2018, to provide notice of an alleged Force Majeure Event under the TSA (the "**Force Majeure Notice**").[125]  Pursuant to the Force Majeure Notice, signed by Merrill, Sequitur asserted that "there presently exists the following situation that is not within [Sequitur's] reasonable control: the unavailability, interruption, delay, or curtailment of rail transportation services for the Product, despite continued efforts to procure such services" (the "**Claimed Force Majeure**").  Sequitur did not provide any additional detail with respect to the nature of the "unavailability, interruption, delay, or curtailment of rail transportation services" asserted but claimed that it anticipated that the Force Majeure situation would continue for the foreseeable future.

Unsurprisingly, shortly thereafter, on December 11, 2018, Eldridge internally reported to Johansen that, effective December 10, 2018, the Phase I Infrastructure could be listed as "in service" for accounting depreciation purposes.[126]  And in the December 11, 2018, internal Sequitur weekly status report, the Barnhart Facility Phase I Project was described as "Complete".[127]

---

[125] *See* Plaintiff Exh. 27; Defendant Exh. 103.

[126] *See* Plaintiff Exh. 274; *see also* Plaintiff Exhs. 89 and 235.  The parties agreed that title to the Phase I Infrastructure would remain with and be vested in Sequitur, which is why Sequitur would be depreciating such property on its books. *See* TSA § 2.7.

[127] *See* Plaintiff Exh. 74.  Here, again, while the report specified that certain aspects of the optional Phase II oil gathering facility project had not yet been completed, the triggering of the Terminal Operations Commencement Date was tied to the Phase I railyard project (the project reflected as "Complete"), not the optional Phase II oil gathering facility project.  *See also* Plaintiff Exhs. 76 (12/18/2018 internal weekly status report indicating "Vista Railyard – 100% Complete") and 230 (1/2/2019 internal Sequitur report indicating same).

**M.**     ***Maalt Contests the Claimed Force Majeure and Bills Sequitur for a Fourth Quarter 2018 Shortfall Payment; Sequitur Disputes the Invoice and Sends a Termination Notice; Litigation Ensues***

Disagreeing with the Force Majeure Notice and believing that all conditions for the triggering of the Terminal Operations Commencement Date had been met in December 2018, Maalt (through Vista) issued an invoice to Sequitur for a fourth quarter 2018 Shortfall Payment on January 25, 2019.[128]  By letter dated January 31, 2019, Sequitur disputed the invoice.  It asserted that the invoice was improper for two reasons: the continuing existence of the Claimed Force Majeure; and the non-occurrence of the Terminal Operations Commencement Date.[129]

Not long thereafter, Sequitur sent another letter to Maalt, dated February 8, 2019 (the "**Termination Notice**"), to provide notice of its election to terminate the TSA pursuant to § 8.4 on account of the alleged existence of the Claimed Force Majeure for a period of sixty consecutive days (the "**Claimed TSA Termination Grounds**").[130]  No evidence was introduced by Sequitur of any meaningful effort on its part to secure rail transportation services between the time of issuance of the Force Majeure Notice and the Termination Notice.

On February 13, 2019, in response to the Termination Notice, Maalt filed suit against Sequitur, thereby initiating the State Court Case.

### DISCUSSION

**A.**     ***Claims and Defenses of the Parties***

**1.**     <u>***Maalt's Claims and Sequitur's Affirmative Defenses***</u>

Pursuant to the Complaint, Maalt has asserted two claims against Sequitur: (1) a breach of contract claim under the TSA; and (2) a declaratory judgment claim under the Texas Uniform

---

[128] *See* Defendant Exh. 112 (1/25/2019 invoice transmitted to Sequitur on 1/28/2019).

[129] *See* Defendant Exh. 113.

[130] *See* Plaintiff Exh. 32; Defendant Exh. 114.

Declaratory Judgments Act (the "**TUDJA**") (chapter 37 of the Texas Civil Practice & Remedies Code (the "**TCPRC**")).

First, asserting that the Terminal Operations Commencement Date occurred on December 10, 2018, and that both the Force Majeure Notice and Termination Notice were ineffective, Maalt seeks damages against Sequitur for breach of contract on account of Sequitur's failure to make the Shortfall Payments provided for under the TSA during the Term of the Agreement.  Maalt also seeks the recovery of interest on the unpaid Shortfall Payments at the Interest Rate provided pursuant to § 4.3 of the TSA and attorneys' fees and expenses pursuant to § 15.19 of the TSA. Maalt also predicates its request for attorneys' fees on chapter 38 of the TCPRC.

Second, Maalt seeks the following declaratory relief pursuant to the TUDJA: (a) a determination that the Terminal Operations Commencement Date under the TSA occurred and a determination of the date of its occurrence; (b) a determination that the Claimed Force Majeure alleged by Sequitur did not occur; (c) a determination of the date the payment obligations created by Article 3 of the TSA began; (d) a determination that Sequitur did not have a right to terminate the TSA; (e) a determination that Sequitur repudiated and breached the TSA by refusing to perform its obligations under the TSA; and (f) a determination that Sequitur is obligated to pay Maalt the Shortfall Payments, equal to 11,424 barrels per day multiplied by $1.50 per barrel for each day of the Term of the TSA.  Maalt asserts that it is also entitled to recover its attorneys' fees pursuant to the TUDJA.

Pursuant to Sequitur's Answer, Sequitur has asserted the following affirmative defenses to Maalt's claims:[131] (i) statute of frauds; (ii) contractual force majeure; (iii) excuse/justification; (iv)

---

[131] Certain additional affirmative defenses have either been waived by Sequitur in its summary judgment papers or determined in favor of Maalt pursuant to the Summary Judgment Orders.  Specifically: (a) Sequitur has waived the affirmative defenses of impossibility, commercial impracticability, and liquidated damages as an unenforceable penalty pursuant to Docket No. 65 (p.2 n.2); (b) Sequitur has waived the affirmative defense of waiver (except to the

failure to mitigate damages; (v) failure of conditions precedent (occurrence of the Terminal Operations Commencement Date and availability of Product transportation services); (vi) breach of contract/repudiation; and (vii) mutual mistake.

### 2.   *Sequitur's Counterclaims/Third-Party Claims and Maalt's and Vista's Affirmative Defenses*

Separately, Sequitur has asserted the following Counterclaims/Third-Party Claims against Maalt and Vista: (1) a breach of contract claim (against Maalt);[132] (2) a promissory estoppel claim (against both); (3) a negligent misrepresentation claim (against both); (4) a fraudulent inducement claim (against both); and (5) a declaratory judgment claim (against Maalt).

In relation to the promissory estoppel, negligent misrepresentation, fraudulent inducement, and breach of contract claims, Sequitur asserts that Maalt and Vista promised/represented to Sequitur that Sequitur would be able to secure a sufficient number of trains and railcars, that Sequitur would be able to secure rail rates, and that Sequitur would be able to secure capable third party transportation service providers.  Sequitur asserts that such promises were not fulfilled and the representations were false, that it relied on the alleged promises/representations to its detriment,

---

extent of the grant of summary judgment in its favor pursuant to the 4/19/21 Summary Judgment Order) pursuant to Docket No. 111-1 (¶ 40); (c) the Court has granted summary judgment in favor of Maalt and against Sequitur on the affirmative defense of failure of conditions precedent (solely to the extent of the assertion by Sequitur that its provision of written notice of the Terminal Operations Commencement Date constitutes an independent condition precedent to performance) pursuant to the 4/13/21 Summary Judgment Order; and (d) the Court has granted summary judgment in favor of Maalt and against Sequitur on the affirmative defenses of failure of consideration, failure of implied conditions of contract, and statute of frauds (in part as to the Statute of Frauds defense, finding the defense inapplicable to Maalt's request to recover Shortfall Payments as the so-called "Minimum Fees") pursuant to the 11/05/21 Summary Judgment Order.  Separately, pursuant to the 4/19/21 Summary Judgment Order, the Court has granted summary judgment *in favor of Sequitur* and against Maalt with respect to Sequitur's affirmative defense of waiver to the extent that Maalt was seeking to recover lost profits as an alternative measure of damages.  To the extent of the waivers/determinations of the affirmative defenses referenced above, they will not be discussed further herein (except for the defense of conditions precedent in relation to the force majeure defense).

[132] To the extent that Sequitur predicated its breach of contract claim on the failure of Maalt to obtain a pollution liability policy or the failure of Maalt to allow Sequitur to retrieve equipment from the Barnhart Facility, Sequitur has waived such claim.  *See* Docket No. 65 (p.2 n.2).

which was foreseeable by Maalt and Vista, and that injustice can be avoided only by awarding damages in excess of $4 million.

In relation to the declaratory judgment claim, Sequitur seeks the following declaratory relief pursuant to the TUDJA: (a) a determination that no Terminal Operations Commencement Date under the TSA ever occurred; (b) a determination that Sequitur properly sent notice of the Claimed Force Majeure on December 7, 2018, and that the Claimed Force Majeure existed; (c) a determination that Sequitur properly sent notice of the Claimed TSA Termination Grounds on February 8, 2019, because a Force Majeure existed for at least sixty days; (d) a determination that the TSA was, in fact, terminated by Force Majeure, effective February 8, 2019; (e) a determination that Sequitur was not obligated to remedy the cause of the Force Majeure occurrence because Sequitur did not deem it reasonable and economic to do so, consistent with the TSA; (f) a determination that Sequitur neither owes nor owed a payment of any kind to Maalt under the TSA; (g) a determination that the enforcement of any Shortfall Payment for any month or for the duration of the Term of the TSA violates public policy, is unconscionable, and/or is an unlawful and unenforceable penalty, such as an improper liquidated damages provision, under Texas law; and (h) a determination that Sequitur's performance under the TSA was made commercially impracticable without its fault by the occurrence of an event(s) the non-occurrence of which was a basic assumption on which the TSA was made.

Finally, Sequitur requests the recovery of attorneys' fees pursuant to the terms of the TSA and chapters 37 and 38 of the TCPRC.

Pursuant to Maalt's Answer and Vista's Answer, both Maalt and Vista have asserted the following affirmative defenses to Sequitur's claims: (i) a promissory estoppel bar due to the existence of a contract; (ii) failure to mitigate damages; (iii) comparative fault pursuant to chapter

33 of the TCPRC; (iv) contributory negligence; and (v) lack of justifiable reliance/disclaimer.

Additionally, in relation to the breach of contract claim, Maalt has asserted the affirmative defenses

of statute of frauds, excused performance on account of a prior breach, and the failure of a

condition precedent (in the last case, referring to § 8.3 of the TSA).

## B.    *The Breach of Contract Claims*

Under Texas law,[133] to recover on a breach of contract claim, the complaining party must

prove by a preponderance of the evidence each of the following elements of the claim: (a) the

existence of a valid contract; (b) the complaining party performed or tendered performance as the

contract required; (c) the defending party breached the contract by failing to perform or tender

performance as the contract required; and (d) the complaining party sustained damages as a result

of the breach.[134]   With respect to the first element (the existence of a valid contract), the

complaining party must establish the following: (i) an offer was made; (ii) the other party accepted

in strict compliance with the terms of the offer; (iii) the parties had a meeting of the minds on the

essential terms of the contract (mutual assent); (iv) each party consented to those terms; and (v)

the parties executed and delivered the contract with the intent that it be mutual and binding.[135]

### 1.    *Maalt's Breach of Contract Claim*

Maalt's breach of contract claim is brought pursuant to the TSA.  Maalt asserts that the

TSA is a valid contract, that it timely performed all of its obligations up until the time that Sequitur

repudiated the TSA with the sending of the Termination Notice, that Sequitur breached the TSA

by failing to pay the 4Q 2018 Shortfall Payment, that Sequitur thereafter repudiated the Agreement

---

[133] In addition to the fact that all events at issue in this case took place within Texas, Maalt and Sequitur agreed that
the TSA would be governed by Texas law.  *See* TSA § 15.11.

[134] *See USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

[135] *Id.*

by purporting to terminate it pursuant to the Termination Notice and thereafter further breached

the Agreement by failing to pay all future Shortfall Payments during the Term, and that Maalt

suffered damages in the amount of all of the unpaid Shortfall Payments during the Term (plus

interest thereon at the contracted Interest Rate and the fees and expenses incurred in connection

with this litigation).  Sequitur has attacked a number of these assertions pursuant to its affirmative

defenses.

### a.    *Existence of Valid Contract*

Initially, in asserting the affirmative defenses of statute of frauds and mutual mistake,

Sequitur appears to challenge the existence of a valid contract.  Neither of these defenses, however,

has merit.

Texas' version of the Statute of Frauds is found in chapter 26 of the Texas Business &

Commerce Code (the "**TBCC**").  Pursuant to TBCC § 26.01(a), a promise or agreement described

in subsection (b) of § 26.01 is not enforceable unless the promise or agreement, or a memorandum

of it, is in writing and signed by the person to be charged with the promise or agreement or by

someone lawfully authorized to sign for such person.[136]  As relevant here, among the agreements

described in subsection (b) is an agreement which is not to be performed within one year from the

date of making the agreement.[137]  Because Maalt and Sequitur reached agreement on a business

arrangement that would span the period of August 6, 2018 through at least the end of 2019 (*i.e.*,

longer than one year), any agreement between them would need to be in writing and signed by

Sequitur in order to be enforceable against Sequitur.[138]  That's exactly what the TSA is – a written

---

[136] Tex. Bus. & Com. Code § 26.01(a).

[137] *Id*. § 26.01(b)(6).

[138] *See Fuller v. Wholesale Elec. Supply Co. of Houston, Inc*., 631 S.W.3d 177, 183 (Tex. App. – Houston [14th Dist.] 2020, no pet.) ("[W]hen, either because of the agreement's term or the nature of the required acts, the agreement

agreement signed by van den Bold, Sequitur's President, on behalf of Sequitur.  Sequitur does not

dispute that the TSA was validly executed.  It appears that Sequitur has merely asserted the defense

in an effort to preclude any possibility of a claim based on terms outside of the terms memorialized

within the TSA.  Because Maalt has asserted its breach of contract claim based solely upon the

express terms of the TSA, the Statute of Frauds is not applicable.

Turning to the defense of mutual mistake, "[a] party relying on the affirmative defense of

mutual mistake must establish 'what the parties' true agreement was and that the instrument

incorrectly reflects that agreement because of a mutual mistake.'"[139]  "The key to mutual …

mistake is the existence of an actual *mistake* on the part of … both parties to a contract."[140]  With

the foregoing in mind, Sequitur has failed to identify any mistake – much less a *mutual* mistake –

in relation to the TSA.  Additionally, Sequitur has failed to present any evidence suggesting that

the TSA has in any way incorrectly memorialized the parties' intended agreement.  Consequently,

Sequitur's defense of mutual mistake is overruled.

With those defenses out of the way, the Court finds that Maalt has successfully established

that the TSA memorializes the parties' exchange of offers and acceptances and their mutual assent

and consent to all of the terms therein, and that their execution and delivery of the TSA to one

another was undertaken with the intent for the TSA to be mutual and binding.  Accordingly, Maalt

has successfully established that TSA is a valid contract.

---

cannot be performed within one year, the statute of frauds applies and renders any non-complying agreement unenforceable").

[139] *Navasota Res., LP v. First Source Tex., Inc.*, 249 S.W.3d 526, 539 (Tex. App. – Waco 2008, pet. denied) (quoting *Atlantic Lloyds Ins. Co. of Tex. v. Butler*, 137 S.W.3d 199, 213 (Tex. App. – Houston [1st Dist.] 2004, pet. denied)).

[140] *Id.* (emphasis in orig.).

### b.      Performance/Tendered Performance

Turning to performance, the Court also finds that Maalt performed of all its contractual obligations under the TSA through the time that it was excused from further performance because of Sequitur's repudiation/material breach of the Agreement in sending the Termination Notice.[141] Among other things, Maalt obtained all of the necessary Permits for the operations as required by TSA § 6.5, Maalt coordinated with Sequitur in obtaining all other necessary Regulatory Approvals as required by TSA § 2.1, Maalt provided Sequitur with the exclusive right to use the Barnhart Terminal for Product transloading in accordance with TSA § 2.3, and Maalt was ready, willing, and able to provide the Services contracted for in accordance with TSA § 2.2.

On the last point, at trial Sequitur appeared to take issue with whether Maalt was really ready and able to perform the Services based upon the number of trained employees that Maalt actually had on board.  As Hecht explained, by late August or early September 2018, Maalt had at least eight employees already on board that had gone through all of the necessary training.  The plan was to work up to a total of twelve employees who would essentially be on call, ready to go at any moment, and to then quickly ramp up to as many as 30 employees once the operations had actually commenced.  He had no concern with respect to the ability to quickly hire and train the new employees once needed.  Moreover, at no time did Sequitur ever provide notice to Maalt of its failure to perform any of its obligations as contemplated by TSA § 8.3.  And van den Bold acknowledged that, to his knowledge, there was nothing that Sequitur had asked Maalt to do that it had not done.

---

[141] *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance") (quoting *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004)).

Consequently, the Court finds that Maalt successfully established that, through the date of Sequitur's repudiation/material breach of the TSA, Maalt performed all of its contractual obligations under the TSA.

### c.    Breach of the Agreement

Turning to the question of whether Sequitur breached the TSA, there are two important facts that are undisputed: *first*, that Sequitur never brought any oil to the Barnhart Facility for transloading services; and, *second*, that Sequitur never made any Shortfall Payments to Maalt under the TSA.  Thus, the only way that Sequitur can avoid a finding of breach is if it can successfully establish that its obligation to pay was never triggered under the terms of the TSA or it was excused from having to perform such obligation.  Sequitur has pursued both angles in asserting the affirmative defenses of failure of conditions precedent, contractual force majeure, breach/repudiation, and excuse/justification.  Importantly, while Maalt bears the burden of proof on the satisfaction of conditions precedent as part of its breach of contract claim, Sequitur bears the burden of proof on all other defenses.

### (i) Failure of Conditions Precedent

First, Sequitur asserts that its obligation to pay was never triggered because the TSA provided that such obligation would not arise until after the Terminal Operations Commencement Date had occurred under the TSA and the conditions precedent to the triggering of the Terminal Operations Commencement Date were never satisfied.  In particular, Sequitur asserts that, as reasonably determined by it, the Terminal was never fully operational and all of the Regulatory Approvals were not obtained.  Sequitur further asserts that it never sent a written notice to Maalt evidencing its determination that such conditions precedent had been met, and that the sending of such written notice was an independent condition precedent.  Needless to say, Maalt takes the

opposite view with respect to the Terminal being operational and the obtaining of Regulatory Approvals, and as discussed in the 4/13/21 Summary Judgment Order, Maalt asserts that the provision of written notice by Sequitur is not an independent condition precedent, but rather a notice covenant.

In considering whether the operational Terminal and Regulatory Approval conditions were satisfied, it is first necessary to consider the impact of the TSA's assignment to Sequitur of the right to "reasonably determine" whether the conditions have been met. Does that effectively mean that Sequitur could avoid having to ever pay by simply continuing to make its own self-serving determination that the conditions have not been satisfied? The answer is no. Where a party's performance is conditioned upon the party's own determination of whether constructed improvements have been made to some specified level of satisfaction, Texas courts have generally upheld the party's judgment if made in good faith.[142] But in determining whether such judgment has been exercised in good faith, Texas courts have applied an objective test,[143] which is particularly appropriate where, as here, the TSA itself expressly calls for a "reasonable" determination. "This … objective standard … does not seek to find the mental state of satisfaction of that party, but rather whether the performance would satisfy a reasonable person."[144]

Thus, applying this objective reasonableness standard, the first condition to consider is whether the Terminal was "fully operational to enable the performance and receipt of the Services." As set out above, "Services" is defined in TSA § 2.2 as the receiving, loading, unloading, handling,

---

[142] *See Black Lake Pipe Line Co. v. Union Constr. Co., Inc.*, 538 S.W.2d 80, 88 (Tex. 1976), *overruled in part on other grounds, Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

[143] *See id.* at 89.

[144] *Cranetex, Inc. v. Precision Crane & Rigging of Houston, Inc.*, 760 S.W.2d 298, 302 (Tex. App. – Texarkana 1988, pet. denied); *see also BDB Interests, LC v. Arcadia Fin. Ltd.*, No. 14-06-00055-CV, 2007 WL 949645, at *3 (Tex. App. – Houston [14th Dist.] Jan. 25, 2007, pet. denied).

measuring, and redelivering of Product at the Terminal.  "Operational," in turn, is commonly construed as meaning "[i]n a condition of readiness to perform some intended … function; able and ready to function."[145]  Thus, to be fully operational for purposes of the TSA, the Terminal would need to be fully able and ready to function in a way that would enable the receipt, loading, unloading, handling, measuring, and redelivery of Product at the Terminal.  Looking at it from that perspective, notably Sequitur, itself, internally determined that the Phase I Infrastructure could be listed as being "in service" for accounting depreciation standards as of December 10, 2018.[146]  Under applicable depreciation standards, "[p]roperty is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function."[147]  Thus, as internally recognized by Sequitur, the Phase I Infrastructure was fully operational, as contemplated by the TSA, as of December 10, 2018.  Indeed, on December 11, 2018, Sequitur also internally reported that the Banhart Facility Phase I Project was "complete."

Notwithstanding its internal determinations, at trial Sequitur claimed that the Terminal was never really *fully* operational.  According to Eldridge, as of December 10, 2018, there was still some wiring that had not been fully pulled through certain conduits in dug trenches, there were still some fixes to communications systems that needed to be completed, some or all of the transloaders did not yet have power cables installed, vent lines and flares had not yet been tested, and transloaders had not yet been "proven" using LACT (Lease Automatic Custody Transfer)

---

[145] <u>Online Oxford English Dictionary</u>, "operational" (Oxford University Press, 2nd ed. 1989, rev. 2004) (https://www.oed.com/dictionary/operational_adj); *see also* <u>Black's Law Dictionary</u>, "operational" (12th ed. 2024) (defining as "able to function").

[146] *See generally* 26 U.S.C. § 167(a) (allowing as a depreciation deduction for federal income tax purposes a reasonable allowance for the exhaustion, wear and tear of property used in the taxpayer's trade or business); *see also* 26 C.F.R. § 1.167(a)-1(a).  "The period for depreciation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service."  26 C.F.R. § 1.167(a)-10(b).

[147] 26 C.F.R. § 1.167(a)-11(e).

units.  Of note, all of these claimed deficiencies were matters for which Sequitur was responsible
to complete under the TSA with a Target Terminal Operations Commencement Date of September
1, 2018.  Even so, with respect to any wiring, communications, and power cable issues, Eldridge
acknowledged that those were matters that could be handled within a matter of hours.  With respect
to testing and calibration (which could also be achieved within a matter of hours), on the other
hand, the only way to complete the testing and calibration was to actually use the transloaders to
transload oil into railcars.  At the same time, however, Eldridge curiously testified that there was
no real ability to test or calibrate the equipment without having a sale of oil in place with a
purchaser.  In other words, according to Sequitur, the Terminal was never operational because
certain equipment had never been tested or calibrated and the only way to undertake such testing
and calibration was for the Terminal to be operational.  Such a circular argument is clearly not in
good faith.  In short, the Court finds that Sequitur's claim at trial that the Terminal was never fully
operational was not objectively reasonable, was not made in good faith, and was inconsistent with
its own earlier internal determinations.  As of December 10, 2018, the Banrhart Terminal was
clearly fully able and ready to function in a way that would enable the receipt, loading, unloading,
handling, measuring, and redelivery of Product at the Terminal, with nothing but the final tweaks,
tests and calibration to be completed in connection with the first round of transloading activity.

The second condition to consider is whether all Regulatory Approvals for the Services were
obtained.  In this regard, Maalt established at trial that it had obtained each of the contractually
required Permits that it was obligated to obtain under the TSA and that, to its knowledge, all other
necessary Regulatory Approvals for the provision of the Services were in place.  Sequitur, on the
other hand, relied upon the non-satisfaction of certain of Shell's HSE requirements.  For example,
Perry testified extensively to a Shell HSE worksheet which included a variety of matters that Shell

had flagged as necessary in order for it to do a deal with Sequitur.  Interestingly, in doing so, Perry claimed to have been unaware of the fact that Sequitur had given up on doing a deal with Shell. Irrespective, none of the Regulatory Approval provisions within the TSA tie to the satisfaction of *Shell* HSE standards.  In fact, once Shell was out of the picture, Sequitur eventually abandoned the Shell standards.  And on October 18, 2018, Merrill noted that all of the HSE requirements were complete.[148]  Moreover, pursuant to TSA § 2.1, the parties were required to work together in good faith (and at their own cost and expense) to obtain all necessary Regulatory Approvals prior to the Target Terminal Operations Commencement Date.  And at no point did Sequitur bring to Maalt's attention any complaint or concern about the lack of a Regulatory Approval.  Instead, the evidence at trial established that Sequitur knew that all of the Regulatory Approvals, including the required Permits, had been obtained by December 10, 2018.  The Court finds that Sequitur's claimed determination to the contrary at trial was not objectively reasonable, was not made in good faith, and was inconsistent with the determinations that Sequitur had earlier made.

Finally, Sequitur claims that the Terminal Operations Commencement Date never occurred because it never provided written notice of the Terminal Operations Commencement Date to Maalt.  In other words, Sequitur claims that the provision of such written notice was, in and of itself, a separate condition precedent to the occurrence of the Terminal Operations Commencement Date.  For reasons previously articulated within the 4/13/21 Summary Judgment Order, the Court finds that the written notice language constituted a notice covenant imposed upon Sequitur as opposed to an independent condition precedent to the Terminal Operations Commencement Date. But even if it were an independent condition precedent, the Court finds that it must be excused because its imposition in the face of satisfaction of the operational Terminal and Regulatory

---

[148] *See* Plaintiff Exh. 61.

Approval conditions, will involve an extreme forfeiture or penalty to Maalt and its existence or occurrence forms no essential part of the exchange for Sequitur's performance.

In this regard, Maalt entered into the TSA with the understanding that, in doing so, it was agreeing to provide to Sequitur exclusive use of the Barnhart Facility during the Term. In other words, it agreed to forego all other business opportunities for use of the Barnhart Facility during the Term. In fact, in compliance with the TSA, starting on the Effective Date on August 3, 2018, and continuing through the date of Sequitur's service of the Termination Notice on February 8, 2019, Maalt, in fact, honored such promised exclusivity. And that had serious business ramifications to Maalt because, as recognized by Graham Brisben ("**Brisben**") of PLG Consulting, the expert consulting firm engaged by Sequitur, the arbitrage advantage ended in February 2019 (despite the earlier belief that it would extend through the end of 2019) – the same month in which Sequitur served the Termination Notice. Thus, in entering into the TSA, Maalt lost out on the opportunity to exploit the arbitrage opportunity with anyone else. Hence, to now allow Sequitur to sidestep its payment obligations on the basis of a unilateral decision to withhold a written notice that had no independent bearing upon the ability to operate/conduct transloading Services will result in an extreme forfeiture and penalty to Maalt. Simply put, the notice provision had no purpose other than to put Maalt on notice of the impending delivery of oil and the commencement of transloading Services. It was not intended to serve as an essential, independent gatekeeping function to Sequitur's performance. The essential gatekeeping protections were the operational Terminal and Regulatory Approval conditions.

For all of the foregoing reasons, the Court finds that Maalt successfully established that all of the conditions precedent to the Terminal Operations Commencement Date and to Sequitur's obligation to make the Shortfall Payments were satisfied.

*(ii) Contractual Force Majeure*

Next, Sequitur claims that it was excused from performing based upon the Claimed Force Majeure under the TSA, and that the Claimed Force Majeure was never resolved prior to issuance of the Termination Notice.   In particular, relying upon the language of TSA § 14.2, Sequitur asserted, as of December 7, 2018, that "there presently exists the following situation that is not within [Sequitur's] reasonable control: the unavailability, interruption, delay, or curtailment of rail transportation services for the Product, despite continued efforts to procure such services."  Maalt disputes the same.

Under Texas law, "when the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure" and a court is not at liberty to rewrite the terms of the parties' deal.[149]  As explained in the 4/13/21 Summary Judgment Order, there are two aspects of "rail transportation services" to evaluate: (1) the availability of linehaul transportation from the point of origin to the point of destination; and (2) the availability of regulatory compliant railcars.  Sequitur asserts that neither of these aspects of rail transportation services was available as of December 7, 2018.  Sequitur had the burden of proving the same at trial.

First, with respect to linehaul transportation, Sequitur appears to predicate its argument of unavailability upon the apparent lack of power share or run-through agreements between certain of the Class 1 railroads (*i.e.*, Union Pacific, BNSF, and KCS) and one or both of the short-line railroads (*i.e.*, TXPF and FWWR).  While a power share/run-through agreement would have been necessary to pull 90-car trains over certain routes (*e.g.*, over FWWR's tracks), there was no need

---

[149] *Allegiance Hillview, LP v. Range Tex. Prod., LLC*, 347 S.W.3d 855, 865 (Tex. App. – Fort Worth 2011, no pet.) (quoting *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 283 (Tex. App. – Amarillo 1998, pet. denied)); *see also Perlman v. Pioneer Ltd. P'ship*, 918 F.2d 1244, 1248 (5th Cir. 1990).

for such an agreement for 75-car trains.  Each of the railroads (whether a Class 1 or a short-line) could independently handle 75-car trains.  While, ideally, Sequitur was planning for 90-car trains given the capacity to handle 90 cars at a time at the Barnhart Facility, there was absolutely nothing to prevent Sequitur from going with 75-car trains instead.  And each of the railroads indicated that it had the capacity to take on additional business.

In relation to rates, per Meador (TXPF), Union Pacific and BNSF both had TXPF rates, thereby enabling it to provide a published rate to Sequitur had Sequitur ever approached Union Pacific or BNSF with a definitive request for transportation.  Meador further explained that KCS had rates from both TXPF and FWWR and, hence, was also able to provide a published rate to Sequitur had Sequitur ever approached KCS with a definitive request for transportation.  Sequitur presented no evidence of the above-referenced railroads ever refusing to provide rail service.  The railroads simply needed specifics, something that Sequitur was never able to provide because it would never pull the trigger with a JV partner.  Indeed, during the relevant time frame, Union Pacific was shipping crude for Jupiter to the Gulf Coast (via TXPF to Union Pacific); KCS was shipping crude for BioUrja to the Gulf Coast (via TXPF, to FWWR, to KCS); and BNSF was shipping crude for Plains All American (via TXPF to BNSF).  Moreover, as explained by Monroe (KCS), by the end of 2018, KCS also had a power share agreement in place with both TXPF and FWWR which would have enabled the pulling of 90-car trains.

Thus, the Court finds that Sequitur failed to carry its burden of proving that linehaul transportation was unavailable as of December 7, 2018.

Second, with respect to the unavailability of regulatory compliant railcars, it is fair to say that the market was tight during the period in question.  By the end of 2018, both Union Pacific and BNSF were requiring 117 railcars.  And as explained by Brisben, Sequitur's expert, by the end

of 2018, the lead time on obtaining new 117 railcars was roughly 15 months, the lead time on

obtaining 117R railcars was roughly 12 months, and the leasing/subleasing market for 117 and

117R railcars had substantially dried up.  Based upon such conditions, Brisben opined that there

were no regulatory compliant railcars available to Sequitur as of December 7, 2018.

That said, Brisben also acknowledged that he was not tasked with investigating the efforts

that Sequitur had actually undertaken to secure railcars and, thus, was unaware of what options

may have actually been available to Sequitur.  For example, Brisben was unaware of the fact that

Sequitur had been introduced to APB early on, that APB had offered to provide railcar procurement

consulting services to Sequitur, and that APB had a lead on a 117 railcar opportunity in November

2018 that Sequitur would have been aware of if it had not snubbed APB.  Additionally, neither

Brisben nor anyone else on behalf of Sequitur introduced any evidence of any effort undertaken

by Sequitur to directly contact Equinor when the Jupiter railcars were taken back or to directly

contact any of the three main tank car manufacturers (Greenbriar, Trinity, and Union Tank Car) to

see what they actually had available.  Plus, Brisben focused on the availability of 117 railcars.  But

KCS, TXPF, and FWWR were still allowing 1232 railcars over its lines.  In this regard, the KCS

BioUrja business used 1232 railcars throughout 2018 and 2019.  Perhaps most troubling, however,

is the fact that when Sequitur was presented with the opportunity to negotiate an agreement with

Murex (who would be responsible for sourcing its own railcars), Sequitur turned down the

opportunity because it did not want to have to outbid other two-year term, competitive

opportunities in order to obtain the 12-month deal that Sequitur desired.  Of note, the TSA did not

provide for a force majeure event in the event of the unavailability of *affordable* rail transportation

services – it provided for the unavailability of rail transportation services under any financial

circumstance.[150]  In the face of such terms, Texas courts have recognized that force majeure does

not protect against economic disadvantage and a contractual obligation cannot be avoided simply

because performance has become more economically burdensome than a party anticipated.[151]

Thus, the Court also finds that Sequitur failed to carry its burden of proving that regulatory

compliant railcars were unavailable as of December 7, 2018.  As a result, the Force Majeure Notice

was improperly issued, the Claimed Force Majeure was ineffective, and the contractual force

majeure defense is overruled.

### (iii) Breach/Repudiation and Excuse/Justification Defenses

Finally, Sequitur has raised the additional affirmative defenses of breach/repudiation and

excuse/justification.  In relation to such defenses, Sequitur failed to present any evidence of

Maalt's breach or repudiation of the TSA and failed to identify any basis for excuse or justification

outside of the defenses already discussed above.  Therefore, these additional defenses are

overruled.

For all of the reasons set out above, the Court finds that Maalt successfully established that

Sequitur breached the TSA by failing to make each the Shortfall Payments that came due under

the TSA from 4Q2018 through 4Q2019.

---

[150] Sequitur only included an economic-based provision with respect to the obligation to attempt to remedy an existing force majeure event.  *See* TSA § 14.3 (providing that, *after* an event of force majeure has occurred, the party thereby affected is required to use commercially reasonable efforts to remedy the force majeure if the party deems it reasonable and economic to do so).

[151] *Valero Transmission Co. v. Mitchell Energy Corp*., 743 S.W.2d 658, 663 (Tex. Civ. App. – Houston [1st Dist.] 1987, no writ); *see also TEC Olmos LLC v. ConocoPhillips Co*., 555 S.W.3d 176, 182-85 (Tex. App. – Houston [1st Dist.] 2018, pet. denied); *Millers Cove Energy Co., Inc. v. Moore (In re Millers Cove Energy Co., Inc.)*, 62 F.3d 155, 158 (6th Cir. 1995) ("Courts and commentators generally refuse to excuse lack of compliance with contractual provisions due to economic hardship, unless such a ground is specifically outlined in the contract").

### d.      *Damages*

Texas courts have generally recognized three types of damages to compensate for a breach of contract: expectancy, reliance, and restitution damages.[152]  "Expectancy damages award a contract plaintiff the benefit of its bargain."[153]  "The general rule for measuring benefit of the bargain damages is to calculate the difference between what was promised and what was received."[154]

Here, from and after the Terminal Operations Commencement Date and until the end of the Term, Sequitur promised to make a quarterly Shortfall Payment to Maalt in an amount equal to the volume of the Shortfall during the Calendar Quarter (*i.e.*, the Minimum Volume Commitment (11,424 Barrells of Product per day) less the number of Barrells of Product actually Throughput the Terminal) multiplied by the Throughput Fee in effect for such Calendar Quarter (*i.e.*, $1.50 per Barrell).  Patrick Washington, Vista's Controller and Vice President of Finance, accurately testified that the total of all quarterly Shortfall Payments during the Term was $6,614,496:

| Quarter | Total Days | Daily Barrell Commitment | Minimum Volume Commitment | Number of Actually Throughput Barrells | Shortfall | Throughput Fee per Barrell | Shortfall Payment Due |
|---------|-----------|--------------------------|---------------------------|----------------------------------------|-----------|----------------------------|------------------------|
| 4Q2018 | 21 | 11,424 | 239,904 | 0 | 239,904 | $1.50 | $359,856.00 |
| 1Q2019 | 90 | 11,424 | 1,028,160 | 0 | 1,028,160 | $1.50 | $1,542,240.00 |
| 2Q2019 | 91 | 11,424 | 1,039,584 | 0 | 1,039,584 | $1.50 | $1,559,376.00 |
| 3Q2019 | 92 | 11,424 | 1,051,008 | 0 | 1,051,008 | $1.50 | $1,576,512.00 |
| 4Q2019 | 92 | 11,424 | 1,051,008 | 0 | 1,051,008 | $1.50 | $1,576,512.00 |
| | | | | | | TOTAL: | $6,614,496.00 |

Sequitur paid none of the Shortfall Payments.

---

[152] *See Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 193 (Tex. 2000).

[153] *Id.*

[154] *MSW Corpus Christi Landfill, Ltd. v. Gulley-Hurst, LLC*, 664 S.W.3d 102, 106 (Tex. 2023).

Sequitur additionally promised to pay interest on the unpaid amount of each Shortfall Payment at the Interest Rate under the TSA (*i.e.*, the lesser of prime plus 2.0% and the maximum lawful rate under applicable law) starting on the first day following the due date of each such Shortfall Payment (30 days after Sequitur's receipt of an invoice for the Shortfall Payment) until the time of payment of the Shortfall Payment.  In the case of the 4Q2018 Shortfall Payment, Sequitur received the invoice on January 25, 2019.  Thus, interest began to accrue on the 4Q2018 Shortfall Payment on February 25, 2019.  In the case of all other Shortfall Payments, Sequitur was effectively invoiced for the additional Shortfall Payments in February 2019 when Maalt served the original petition on Sequitur following Sequitur's repudiation of the TSA via the Termination Notice.  Because each subsequent quarterly Shortfall Payment would not have come due until after the end of each Calendar Quarter, however, it is appropriate to calculate the accrual of interest on each such Shortfall Payment only beginning on the first day following the 30th day after the end of such Calendar Quarter.[155]  Applying such concepts to the calculation of interest, as of October 1, 2025, interest of $3,190,936.21 had collectively accrued on all unpaid Shortfall Payments, and interest on the outstanding unpaid balance of the Shortfall Payments has continued to accrue thereafter at the Interest Rate under the TSA.

In relation to these damages, Sequitur has asserted the affirmative defense of failure to mitigate.  Under Texas law, "[t]he mitigation of damages doctrine requires the injured party to exercise reasonable care to minimize the damages if damages can be avoided with only slight expense and reasonable effort."[156]  The party asserting a failure to mitigate has the burden of

---

[155] Thus, interest on the 2019 quarterly Shortfall Payments began to accrue starting on the following dates: 1Q2019 – 5/1/2019; 2Q2019 – 7/31/2019; 3Q2019 – 10/31/2019; and 4Q2019 – 1/31/2020.

[156] *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 708 (Tex. App. – Fort Worth 2006, pet. denied) (citing *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995)).

proving lack of diligence on the part of the other party and the amount by which the damages were increased by the failure to mitigate.[157]  With the foregoing in mind, Sequitur asserts that the amount of the Shortfall Payments must be reduced by the transloading service costs that Maalt never had to incur.  In making such argument, however, Sequitur fails to appreciate the purpose of the Shortfall Payment provisions of the TSA.  The Shortfall Provisions were designed to provide a base level of income for Maalt's provision of exclusivity to Sequitur during the Term.  In other words, it was not dependent upon the provision of any Services at all by Maalt.  As such, Sequitur has failed to carry its burden of establishing the amount by which the damages incurred were increased by any alleged failure to mitigate on the part of Maalt.

Consequently, the Court finds that Maalt successfully established the damages that it incurred as a result of Sequitur's breaches of the TSA, and in doing so, also successfully proved up its breach of contract claim against Sequitur and entitlement to the recovery of such damages from Sequitur.

### 2.   *Sequitur's Breach of Contract Claim*

Sequitur's breach of contract claim against Maalt is also brought pursuant to the TSA. However, it is unclear from both the pleading that sets out Sequitur's Counterclaims and the Pretrial Order what Sequitur claims that Maalt failed to do pursuant to the terms of the TSA.[158]  At most, the Pretrial Order refers to alleged "promises [made by Maalt] … to Sequitur that Sequitur

---

[157] *Cotten*, 187 S.W.3d at 687; *Lester v. Logan*, 893 S.W.2d 570, 577 (Tex. App. – Corpus Christi 1994), *writ denied*, 907 S.W.2d 452 (1995); *Geotech Energy Corp. v. Gulf States Telecomm. & Info. Sys., Inc.*, 788 S.W.2d 386, 390 (Tex. App. – Houston [14th Dist.] 1990, no pet.).

[158] *See* Docket No. 45, ¶ 44 (breach of contract Counterclaim); Pretrial Order ¶ I.B. (statement of Sequitur's claims and defenses).

would be able to secure sufficient numbers of trains and rail cars and rail rates…."[159]  But the TSA does not include any such promises by Maalt.

Additionally, Maalt has asserted the affirmative defense of Statute of Frauds which, as explained above, applies to the parties' agreement memorialized within the TSA because of the length of the parties' agreement.  Thus, because the promises alleged by Sequitur are not set forth within the TSA and Sequitur failed to come forward with any other writing signed by Maalt that purported to amend the TSA to include the alleged promises, any purported agreement to such effect is barred by the Statute of Frauds.[160]

In short, Sequitur has failed to carry its burden of establishing a breach of the TSA by Maalt.

## C.    *Sequitur's Promissory Estoppel Claim*

Next, Sequitur has asserted a promissory estoppel claim against both Maalt and Vista. Under Texas law, "[t]he elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance on the promise by the promisor, and (3) substantial detrimental reliance by the promisee."[161]

According to Sequitur, Maalt and Vista "promise[d] that trains and railcars would be available, including at a reasonable price, at the right time, and for the right term", and that Sequitur

---

[159] *See* Pretrial Order, ¶ I.B., at p.11.

[160] *See also* TSA § 15.15 (merger provision providing that the TSA "constitutes the entire agreement between the Parties" and that "[n]o variation, modification or change of the Agreement shall be binding upon either Party unless contained in a written instrument executed by a duly authorized representative of each of the Parties").  Moreover, even if the Statute of Frauds were not applicable, the breach of contract claim would still fail because Sequitur failed to establish that there was ever an offer, acceptance, and meeting of the minds between the parties in relation to such promises.  In fact, when Maalt (through Ince) explained to Sequitur that Maalt could provide third-party logistics support to Sequitur if Sequitur was interested, Sequitur never asked for a quote and never showed any interest in doing a deal with Maalt on that front.

[161] *Rice v. Metropolitan Life Ins. Co*., 324 S.W.3d 660, 673 (Tex. App. – Fort Worth 2010, no pet.) (omitting footnote) (quoting *Hubbard v. Shankle*, 138 SW.3d 474, 482 (Tex. App. – Fort Worth 2004, pet. denied)).

reasonably relied upon such promises to its detriment, resulting in damages in excess of $4 million.[162]  Maalt and Vista dispute that any such promise(s) were made and further dispute any reliance on the part of Sequitur.  The Court agrees.

First, in the case of a promise(s), while Maalt and Vista personnel (in particular, Ince and Favors) were aware of the fact that Sequitur did not have any prior rail logistics experience and they attempted to assist Sequitur with input and referrals, none of Maalt's or Vista's personnel made any assurances to Sequitur about the availability of railroad service and railcars that could be construed as rising to the level of a "promise."  All that Maalt and Sequitur personnel did was provide contact information and introductions to various individuals that they suggested Sequitur should consider reaching out to for assistance, such as Struthers (APB), Meador (TXPF), and Morris (Jupiter).  Indeed, Maalt even offered to serve as Sequitur's logistics coordinator, but Sequitur declined.  Sequitur had its own internal team of sophisticated business and legal personnel – a team that had guided Sequitur through multiple complex transactions in the past.  And at all relevant times, Sequitur had the benefit of guidance from its own outside advisor, EnMark.  Later, Sequitur also obtained the guidance of other outside consultants, including AST.

Moreover, Sequitur cannot seriously contend that it ever relied upon any of the soft assurances made by anyone at Maalt or Vista, much less that any such reliance was "substantial detrimental reliance."  Instead of charging directly into the execution of the TSA, Sequitur started with the LOI so that it would have time to conduct its own due diligence before execution the TSA.  As acknowledged and agreed upon by Sequitur in the LOI, "[f]ollowing the execution of [the LOI] until the end of the LOI Term, the Parties and their designated representatives will conduct due diligence reviews to analyze the feasibility of the contemplated Transaction, which reviews have

---

[162] *See* Docket No. 45, ¶ 41.

not yet been conducted and completed."[163]    Thus, in executing the TSA, Sequitur implicitly acknowledged that, based upon its own due diligence, it had determined that the oil by rail shipments contemplated by the TSA were feasible.    Nowhere within the TSA is the memorialization of any promise(s) on the part of Maalt or Vista with respect to the securing of rail service or railcars.[164]

Thus, for the foregoing reasons, the Court finds that Sequitur has failed to carry its burden of establishing a promissory estoppel claim against either Maalt or Vista.

### D.    *Sequitur's Fraudulent Inducement and Negligent Misrepresentation Claims*

Separately, Sequitur has also asserted fraudulent inducement and negligent misrepresentation claims against both Maalt and Vista.    Under Texas law, the elements of a fraudulent inducement claim are: (1) the existence of an agreement; (2) the defendant's making of a material representation in relation to the agreement that was false; (3) the defendant's making of such misrepresentation with knowledge that it was false or without knowledge of whether it was true or false; (4) the defendant's making of such misrepresentation with the intent for the plaintiff to act upon it in entering into the agreement; (5) the plaintiff's reliance upon the misrepresentation in entering into the agreement; and (6) injury to the plaintiff as a result of such reliance.[165]    Under Texas law, the elements of a negligent misrepresentation claim in a commercial context are: (1) a representation made by the defendant in the course of its business or in a transaction in which it has a pecuniary interest; (2) the representation conveyed false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in

---

[163] *See* LOI ¶ 6.

[164] *See also* TSA § 15.15 (contractual merger clause, whereby the parties agreed that the TSA constituted the entire agreement between the parties).

[165] *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001); *Formosa Plastics Corp. USA, v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

obtaining or communicating the information; (4) justifiable reliance on the representation by the

plaintiff; and (5) pecuniary loss suffered by the plaintiff as a result of such justifiable reliance.[166]

Common to both claims is the requirement of (a) a material misrepresentation, and (b) reliance

thereon by the complaining party. Maalt and Vista assert that Sequitur has failed to establish both

of these elements in relation to both of the claims. The Court agrees.

First, with respect to the alleged misrepresentations at issue, Sequitur has identified the

following representations as having been made by Maalt and/or Vista (as applicable) in the

pleading that sets out Sequitur's Counterclaims and Third-Party Clams and/or in the Pretrial

Order:[167]

> (1)    Maalt's (through Ince) description of Jupiter as "the real deal;"[168]
>
> (2)    A representation that Jupiter had trucking capabilities and relationships with railroad companies;[169]
>
> (3)    Maalt's/Vista's (through Favors) representation that Maalt had received an offer from Jupiter for the Barnhart Facility with an offer to pay $8 million up front;[170]
>
> (4)    A representation that Jupiter had access to 1600 railcars and could manage 10 to 12 locomotives per month;[171]
>
> (5)    A representation(s) to Sequitur that Sequitur would be able to secure sufficient numbers of trains and rail cars and rail rates.[172]

Each of these alleged representations are considered in turn.

First, with respect to Ince's alleged description of Jupiter as "the real deal," the Court finds

that Ince did, in fact, make such statement and that he believed that Jupiter was, in fact, the real

---

[166] *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653-54 (Tex. 2018) (citing *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1992)).

[167] *See generally* Docket No. 45 and Pretrial Order ¶ I.B.

[168] *See* Docket No. 45, ¶ 14; Pretrial Order, ¶ I.B., at p.9.

[169] *See id.*

[170] *See* Docket No. 45, ¶ 18; Pretrial Order, ¶ I.B., at p.9.

[171] *See* Docket No. 45, ¶ 19.

[172] *See id.*, ¶ 32; Pretrial Order, ¶ I.B., at p.9.

deal based upon information that he then knew about Jupiter. At trial, Sequitur further delineated the false statements allegedly made by Maalt to induce Sequitur to engage in business with Jupiter: (a) that Jupiter had rail rates; (b) that Jupiter had a downstream offloading location; (c) that Jupiter had access to railroads; and (d) that Jupiter had everything that it needed to get railcars to the Gulf Coast and back. As of the time that Sequitur determined to pivot to Jupiter, none of these represented facts, to the extent actually made by Maalt, was false. In fact, by the time that Sequitur determined to pivot to Jupiter, Jupiter was already shipping crude out of the Pecos Facility to the Gulf Coast. Thus, Maalt (Ince) knew that Jupiter had, in fact, an established relationship with TXPF and Union Pacific, that it had certain railcars under its control along with an established relationship with a railcar supplier, and that it had offloading capacity at the Gulf Coast. Thus, there was nothing false about the representation made by Ince.

Second, with respect to the representation about trucking capabilities and railroad company relationships, at trial it became clear that such representations were actually made directly by Jupiter to Sequitur at an in-person meeting among Jupiter and Sequitur personnel on June 6 or 7, 2018. Neither Maalt nor Vista had any involvement in the meeting. Even so, Sequitur did not present any evidence of the falsity of such representations as of the date on which they were made.

Third, with respect to Favors' representation to Sequitur of the competing offer made by Jupiter for the Barnhardt Facility (including the proposed $8 million up front payment), the evidence introduced at trial established that such offer was, in fact, made by Jupiter.

Fourth, with respect to the representation regarding Jupiter's access to 1600 railcars and ability to manage 10 to 12 locomotives per month, the evidence at trial established that such representation, if and to the extent ever made, was made directly by Jupiter to Sequitur without any involvement of either Maalt or Vista.

Finally, with respect to any alleged overall representation(s) regarding Sequitur's ability to secure sufficient numbers of trains, railcars, and rail rates, for reasons already noted above in relation to Sequitur's promissory estoppel claim, Sequitur has failed to present credible evidence of any such broad based representations, assurances, or promises on the part of Maalt or Vista that were false.   To support a fraudulent inducement or negligent misrepresentation claim, the representation at issue must concern a material *fact*, as opposed to a mere opinion or judgment of probability or expectation.[173]   Here, at most, personnel of Maalt and/or Vista simply expressed the belief that Sequitur would be able to line up rail service from the Barnhart Facility to the Gulf Coast.   Even so, Sequitur also failed to present convincing evidence that there was, in fact, an inability to line up railcars and a viable means of rail service to the Gulf Coast during the relevant period in question.

Next, with respect to the requirement of reliance, Sequitur also failed to carry its burden of establishing that it relied upon any alleged representation made by Maalt and/or Vista.  In relation to statements about Jupiter's capabilities, Sequitur never took Maalt's/Vista's word for it.  Instead, it engaged in its own due diligence by following up directly with Jupiter in independent communications and in-person meetings.  Neither Maalt nor Vista were included in such separate communications or meetings; instead, Sequitur conducted its own, independent assessment of Jupiter's capabilities and Morris (Jupiter) independently validated/confirmed everything that Maalt/Vista had ever passed along to Sequitur.  In relation to any general statements made about the availability of rail service, including railcars, Sequitur similarly undertook its own investigation and diligence into such matters, determining to, among other things, bypass Maalt's

---

[173] *See Harding Co. v. Sendero Res., Inc.*, 365 S.W.3d 732, 747 (Tex. App. – Texarkana 2012, pet. denied); *see also Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995).

offer to provide logistical support services and bypass Maalt's recommendation of APB for railcar

assistance.  Instead, Sequitur relied upon its own internal team coupled with the assistance of such

outside advisors as EnMark and AST.

In short, Sequitur has failed to present sufficient credible evidence to support a claim of

fraudulent inducement or negligent misrepresentation against either Maalt or Vista.[174]

### E.      The Sequitur Bankruptcy Claims and Claim Objection

Pursuant to section 502(b)(1) of the Bankruptcy Code, in the event of the filing of an

objection to a claim asserted against a debtor, the court must disallow the claim to the extent the

claim is unenforceable against the debtor and property of the debtor under any agreement or

applicable law for a reason other than because such claim is contingent or unmatured.[175]  As

previously indicated, the Bankruptcy Claims asserted by Sequitur against Maalt and Vista are

predicated upon the Counterclaims and Third-Party Claims asserted by Sequitur against Maalt and

Vista in this litigation.  Thus, because the Court has determined that none of the Counterclaims

against Maalt, and none of the Third-Party Claims against Vista, has merit, the Claim Objection

will be sustained and the Bankruptcy Claims will be disallowed.

### F.      The Declaratory Judgment Claims

Turning next to the parties' respective declaratory judgment claims made pursuant to the

TUDJA, it is initially important to note that the TUDJA has no application within the federal court

system, even in the case of the removal of such claims from state court.  Instead, "the removal to

---

[174] As a result, it is unnecessary for the Court to consider the additional affirmative defenses of contributory negligence and comparative fault.

[175] *See* 11 U.S.C. § 502(b)(1).

federal court causes the claim to be viewed as brought under the [federal] Declaratory Judgment Act."[176]

As applicable to this case, the federal Declaratory Judgment Act (the "**FDJA**") provides that "[i]n a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[177] Significantly, because of the discretionary language used within the FDJA, the FDJA has been construed as an authorization, not a command, and "[f]ederal courts have broad discretion to grant or refuse declaratory judgment."[178]

Here, the parties' respective declaratory judgment requests have largely been addressed in connection with resolving the other claims asserted.  However, to provide the parties with the clarity that they desire in relation to the specific claims asserted, the Court makes the following determinations:

1. The Terminal Operations Commencement Date under the TSA occurred on December 10, 2018.

2. Sequitur failed to establish by a preponderance of the evidence that the Claimed Force Majeure under the TSA in fact occurred/existed.

3. With respect to the date on which Sequitur's payment obligations under article 3 of the TSA began: (a) in the case of the 4Q2018 Shortfall Payment, the payment came due on February 24, 2019 (30 days after the issuance of the January 25, 2019 invoice); and (b) in the case of the 1Q2019, 2Q2019, 3Q2019, and 4Q2019 Shortfall Payments, the payments respectively came due on the 30th day after the end of each such quarter for the reasons previously indicated (*see* Discussion, § B.1.d.).

---

[176] *Edionwe v. Bailey*, 860 F.3d 287, 294 n.2 (5th Cir. 2017) (quoting *i2 Techs. US, Inc. v. Lanell*, No. CIV.A. 302CV0134G, 2002 WL 1461929, at *7 n.5 (N.D. Tex. July 2, 2002)), *cert. denied*, 583 U.S. 1057 (2018); *see also Redwood Resort Props., LLC v. Holmes Co. Ltd.*, Civil Action No. 3:06-CV-1022-D, 2007 WL 1266060, at *4 (N.D. Tex. Apr. 30, 2007).

[177] 28 U.S.C. § 2201(a).

[178] *Redwood Resort Props., LLC*, 2007 WL 1266060, at *4 (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) and *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1992)).

4.     Sequitur failed to establish by a preponderance of the evidence that, under the terms of the TSA, it validly terminated the TSA pursuant to the Termination Notice on the basis of the Claimed TSA Termination Grounds.

5.     In issuing and delivering the Termination Notice to Maalt, Sequitur repudiated, and thus materially breached, the TSA as of February 8, 2019.

6.     Based upon all of the facts determined above and the discussion set out above, the enforcement of the Shortfall Payment obligations under the TSA does not violate public policy and is not unconscionable.  The Shortfall Payment obligations of the TSA do not constitute an unlawful or unenforceable penalty or an improper liquidated damages provision under Texas law.

7.     Sequitur failed to establish by a preponderance of the evidence that its performance under the TSA was made commercially impracticable.

To the extent that the parties have requested any other declaratory relief, the Court declines to provide such relief, determining that it is unnecessary given the determinations made by the Court in connection with the other claims and defenses asserted by the parties.

## G.     The Parties' Respective Requests for Attorneys' Fees and Expenses

Finally, with respect to the parties' respective requests for an award of attorneys' fees and expenses, in the case the breach of contract claims, because TSA § 15.19 provides for the prevailing party's recovery from the losing party of the reasonable fees and expenses incurred by the prevailing party in enforcing its rights under or with respect to the Agreement, Maalt is entitled to recover the reasonable attorneys' fees and expenses incurred by it in prosecuting its breach of contract claim and in defending against Sequitur's breach of contract claim.  An award of attorneys' fees in favor of Maalt is also supported by the provisions of chapter 38 of the TCPRC.[179]

In the case of the declaratory judgment claims, the claims have morphed into federal Declaratory Judgment Act claims as explained above.  As such, chapter 37 of the TCPRC (the

---

[179] *See* TCPRC §§ 38.001(b)(8) (providing for attorneys' fees to be recoverable in addition to the amount of a valid claim and costs if the claim pursued is one for breach of a written contract) and 38.002 (providing that the right to recover such attorneys' fees is dependent upon (1) the claimant being represented by an attorney, (2) the presentment of the underlying claim to the opposing party or a duly authorized agent of the opposing party, and (3) payment for the just amount owed on the claim not having been tendered before the expiration of 30 days after presentment of the claim).

TUDJA) is no longer applicable and does not serve as a basis for the recovery of attorneys' fees. In relation to the federal Declaratory Judgment Act, "attorney's fees are recoverable 'only where they are recoverable under non-declaratory judgment circumstances.'"[180]  In other words, there must be an independent basis for the award of such fees outside of the Declaratory Judgment Act. Here, putting aside Maalt's right to the recovery of attorneys' fees in relation to the breach of contract claims, there is no such independent basis for recovery.  Therefore, the requests for attorneys' fees predicated solely upon the Declaratory Judgment Act will be denied.

With respect to the attorneys' fees and expenses awardable to Maalt, by agreement of the parties the amount of such fees and expenses will be determined by motion practice in accordance with the provisions of Rule 7054(b)(2) of the Federal Rules of Bankruptcy Procedure and Rule 54(d)(2) of the Federal Rules of Civil Procedure.  Accordingly, the Court will separately issue an order establishing applicable deadlines for such process.

### *CONCLUSION*

Based upon all of the foregoing, once the amount of reasonable attorneys' fees and expenses awardable to Maalt has been determined, the Court will separately enter a final judgment providing for the following relief:

(a) that, in relation to Maalt's breach of contract claim and on account of Sequitur's breach of the TSA, Maalt recover against Sequitur damages in the principal amount of $6,614,496 (the "**Shortfall Payment Damages**"), plus pre-judgment interest thereon in the amount of $3,190,936.21 through October 1, 2025, plus continuing pre- and post-judgment interest on the unpaid balance of the Shortfall Payment Damages from and after October 1, 2025, at the TSA Interest Rate until the Shortfall Payment Damages have been paid in full;

(b) that, in relation to Sequitur's breach of contract, promissory estoppel, fraudulent inducement, and negligent misrepresentation Counterclaims and Third-Party Claims, Sequitur take nothing against Maalt and Vista;

---

[180] *Deutsche Bank Trust Co. Americas v. U.S. Energy Dev. Corp. (In re First River Energy, LLC)*, 986 F.3d 914, 930 (5th Cir. 2021) (quoting *Mercantile Nat'l Bank at Dallas v. Bradford Trust Co.*, 850 F.2d 215, 216 (5th Cir. 1988)).

(c) that, in relation to Sequitur's Bankruptcy Claims and Maalt's and Vista's Claim Objection, the Claim Objection be sustained and the Bankruptcy Claims be disallowed in full and in all respects;

(d) that, in relation to the parties' respective declaratory judgment claims, the issuance of the determinations set out in the Discussion, § F, above;

(e) that, in accordance with TSA § 15.19 and pursuant to chapter 38 of the TCPRC, Maalt recover from Sequitur an amount equal to the reasonable attorney's fees and expenses incurred by Maalt in prosecuting its breach of contract claim and in defending against Sequitur's breach of contract claim, as hereafter determined by the Court, plus post-judgment interest thereon at the federal post-judgment interest rate until paid in full; and

(f) that, pursuant to Federal Rule of Bankruptcy Procedure 7054(b)(1), Maalt and Vista each recover from Sequitur an amount equal to the respective costs incurred by them in this action, plus post-judgment interest thereon at the federal post-judgment interest rate until paid in full.

All other requested relief by any party will be denied.

# # #   END OF MEMORANDUM OPINION   # # #